GOLCONDA CATTLE CO. v. UNITED STATES.†

(Circuit Court of Appeals, Ninth Circuit. December 2, 1912.)

No. 2,143.

1. PUBLIC LANDS (§ 19*)—UNLAWFUL INCLOSURE—CONSTRUCTION OF STATUTE —"INCLOSURE."

Act Feb. 25, 1885, c. 149, § 1, 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), prohibiting the inclosure of public lands to any of which land included within the inclosure the person or corporation making or controlling the inclosure has no claim or color of title made or acquired in good faith, in view of the conditions which led to its enactment, should receive a construction which will give effect to its broad purpose. The word "inclosure" as used therein cannot be restricted in meaning to a complete encircling of the land with a fence without openings, but applies to any means whereby there is effected practical separation of public land from the body thereof.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*

For other definitions, see Words and Phrases, vol. 4, pp. 3498, 3499.]

2. PUBLIC LANDS (§ 19*)—UNLAWFUL INCLOSURE.

Defendant cattle company maintained a post and wire fence 44 miles long around 37,000 acres of land, 26,000 of which was public land and 11,000 privately owned, the most of it by defendant. It was for the most part bottom land and practically surrounded that owned by the government. No part of the fence was on the public land. There were about nine openings in the fence each 100 feet or more in length but separated by long distances and some where the ground was very rough and almost inaccessible. Held, that it constituted an unlawful inclosure within the meaning of Act Feb. 25, 1885, c. 149, § 1, 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), the maintenance of which was properly enjoined under section 2 of the act.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

3. PUBLIC LANDS (§ 19*)—UNLAWFUL INCLOSURE—SUIT FOR INJUNCTION.

Inclosure of any of the public land or maintaining such an inclosure except by one making claim to the land in good faith is made unlawful by Act Feb. 25, 1885, c. 149, § 1, 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), and the intent with which the inclosure was made or is maintained is immaterial in a suit in equity for an injunction under section 2.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

4. PUBLIC LANDS (§ 19*)—POWER OF GOVERNMENT TO PROTECT—UNLAWFUL INCLOSURE.

The enforcement of a decree for the removal or destruction of an unlawful inclosure of public lands rendered under Act Feb. 25, 1885, c.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing granted February 24, 1913.

149, § 2, 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), is within the police power of the United States to protect its property and is not an infringement of the constitutional rights of the owner of the inclosure.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

Appeal from the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Suit in equity by the United States against the Golconda Cattle Company. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 196 Fed. 240.

William Denman and Charles R. Lewers, both of San Francisco, Cal. (G. S. Arnold, of counsel, of San Francisco, Cal.), for appellant.

Samuel Platt, U. S. Atty., of Carson City, Nev.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The United States brought this bill in equity before the District Court in and for the District of Nevada, to restrain the Golconda Cattle Company, a cattle raising corporation, from maintaining a certain fence alleged to inclose about 26,000 acres of public land in Elko county, Nev. The bill charged that the Golconda Cattle Company continuously, from May, 1910, maintained and controlled an inclosure made of posts and wire and natural barriers about the land; and that the fence was so constructed as to prevent stock, such as cattle, horses, sheep, etc., from passing over, under, or through the same.

The Golconda Company denied that it had ever maintained or controlled an inclosure of any of the lands described in the complainant's bill, by means of fence or in any other way. The company admitted that there were fences upon or near various portions of the land described in the bill, but averred that they were not constructed so as to prevent live stock from passing through the same; that in many places there were holes and openings through the fences; that, while there were fences and portions of fences on some of the land, they were not constructed or joined so as to constitute an inclosure; that stock and vehicles could freely pass through the openings and across the lands described in the bill; that there was an open public road leading into the tract and passing out of the same; that there were various openings; and that there had been no inclosure for exclusive use of the lands as described.

The District Court found that an inclosure existed and that the law was violated, and then made an alternative order to the effect that unless the defendant should make certain openings, as defined in the opinion of the judge, the inclosure described in the bill should be abated. Thereafter the court made an order reciting that, the openings as fixed in the opinion of the court having been made without reference to the convenience of the public or the defendant, and in the absence of evidence as to the most suitable places therefor, each party should be allowed three months within which to make proofs

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

before a master as to the points where the openings provided for in the opinion might be more conveniently made. This order also provided that a master might be appointed at the instance of either complainant or defendant after five days' notice, but that in the interim the openings would have to be made as indicated in the opinion, or the marshal would be ordered to abate the inclosure. From the order just last referred to, the Golconda Company appeals to this court.

It appears from the evidence and the findings made by the District Court that, inside of certain fences or parts of fences which are owned or controlled by the Golconda Company, there are 26,000 acres of government land and 11,000 acres of lands owned privately; nearly all of such privately owned lands being the property of the Golconda Company. These 11,000 privately owned acres are, generally speaking, bottom lands, and are so situated that they may be said to surround the government lands involved in this controversy. Toejam Mountain lies toward the northeastern part of the entire tract. Toejam creek and Rock creek traverse the bottom lands on the north and west sides, respectively, while Willow creek and Siawappe creek traverse them on the south and east, respectively. In the northeastern end of the tract are the western slopes and foothills of the Rock Creek Mountains. The headwaters of Toejam and Siawappe creeks are less than a mile apart at a point in these foothills. Sixteen miles away, and at a considerably lower level, in a southwesterly direction, the last-named creeks come together. Inside the fences, and just above the junction of Willow and Rock creeks, there are about 2,500 acres of the 11,000 acres privately owned, as hereinbefore stated. The privately owned lands extend on the northern side up Rock creek and Toejam creek toward the northeast end, and on the southern side up Willow creek and Siawappe creek. It was found that the tract of public lands, formed, as just described, was inclosed by a post and wire fence, some 44 miles in length, none of which is on government land.

The learned district judge said:

" * * * All of this fence except about 4 miles on Rock creek immediately above its junction with Willow creek, and a drift fence known as North's fence at the northeast corner of the tract, has been constructed since 1908. About 4 miles above the junction of the two creeks, there is a short lane 150 feet in width, through which passes the public highway from Tuscarora to Midas. From this lane to the next opening in the fence up Rock creek is more than 4 miles in a direct line, and more than 5½ miles by fence. Here is an opening of 100 feet, known as opening No. 3. From this gap to the next, designated as No. 4, 100 feet in length, there are more than 4 miles. From the last opening there are 2½ miles of fence to opening 'B,' 50 feet long. Between this opening (B) and North's fence, there are 2⅝ miles. North's fence, which forms something more than 1½ miles of the inclosure, is old, in poor repair, and down at a number of places. Between North's fence and Nelson's fence there is a gap of 1¼ miles. The country here is rough and mountainous, but not impassable for either cattle or sheep. Following Nelson's fence 1⅓ miles to the south we come to opening 'A,' a gap of 300 feet. From this gap south to opening No. 6, defendant maintains a continuous fence for 4⅝ miles. Gap No. 6 is about 3,400 feet long, and is favorably and conveniently located for the passage of cattle drifting toward Rock Creek Mountains. Between openings 6 and 7 there are more than 4 miles of fence. The last is an opening of 100 feet, through which the road from Tuscarora

enters the field emerging at No. 1 on the west side. 5¾ miles west of opening No. 7 is opening No. 8, 100 feet long. Following the fence from this point in a southwesterly direction down Willow creek around the southwest end of the field, and thence northeast up Rock creek, a total distance of 8 miles, we come to opening No. 1, the place of beginning. There are thus nine openings in a total fence line of more than 40 miles. The evidence shows that cattle belonging to neighboring stockmen have often grazed on the government land in question, since the inclosure was made, and across it in 1910 more than 200,000 sheep were driven from southwest to northeast. The government land is all rough and hilly; it has a general slope toward the southwest, as well as an inclination from the central highland toward Willow creek on the south, and to Rock creek and Toejam creek on the north and west. It affords only a somewhat scant pasturage for about two months in the early spring."

It is not disputed that the fences are along the outside, and not the inside of the cattle company's lands, so that between the fences and appellant's lands lies the large area of public domain involved here. It is impossible to gain access to this land except by crossing land which belongs to the cattle company, either through certain openings in the fences purposely made by the cattle company, or the opening of 3,400 feet situate in the northeastern part of the tract lying at the foot of Toejam Mountain.

[1] Upon this state of facts appellant takes the position that there was no inclosure, and that section 1 of the act of Congress under which this suit was instituted is not applicable. In their essence, the contentions, upon which appellant stands, are: That the fences made by the cattle company are upon its own lands, and were constructed for the sole purpose of protecting its lands; that access to the public lands was not prevented; that openings to the public lands have been maintained; that there has been no assertion of a right by appellant to the exclusive use and occupancy of any of the public lands; and that there has been no exclusion of man or beast from enjoyment of use of the public lands. Statement of these contentions makes it plain that the case turns upon the meaning of the act of Congress entitled "An act to prevent unlawful occupancy of the public lands," approved February 25, 1885, 23 U. S. Stat. L. 321, and to that we shall address ourselves. Before quoting the text of the act, brief reference to matters of general knowledge and legislative history is appropriate.

After the enactment of the homestead act in 1862, there was much immigration to the Western States having large areas of public lands. Naturally the public lands immediately tributary to streams were first settled upon while the uplands were used for grazing purposes. The public lands were not fenced, and the privilege of use of the public domain for stock ranges was not denied by the government. As time passed, the available lands in the creek bottoms became scarce, and settlers were obliged to seek homesteads upon lands back from streams. It was soon proved, however, that such lands could be irrigated and profitably cultivated; hence, as knowledge of these facts spread, demands for such lands by homestead seekers greatly increased. As occupation became more common, settlers fenced their claims, and so the area of public lands available for stock ranges became less extensive. Under these conditions, not infrequently men sought home-

steads upon the public domain which happened to be adjacent to ranches owned by corporations or individuals who possessed large bands of cattle or sheep which required extensive pasture grounds. Such settlements were often unwelcome to stock owners who did not wish to be disturbed in the enjoyment of their accustomed range privileges upon the public lands, or to be interfered with in a sort of exclusive dominion which they had come to exercise over the ranges upon which their stock pastured. This dominion was exerted by constructing fences and utilizing barriers, sometimes natural as well as artificial, to separate their accustomed ranges from the body of the public domain. Often in making the inclosure a fence would be run along the land of the owner to a point where it would connect with a fence on an adjoining ranch, as in Potts v. United States, 114 Fed. 52, 51 C. C. A. 678; sometimes advantage would be taken of a portion of an existing fence and a sheet of water, as in Thomas v. United States, 136 Fed. 159, 69 C. C. A. 157; sometimes a fence would be extended to a precipitous rim rock, as in Hanley v. United States, 186 Fed. 711, 108 C. C. A. 581; or a cañon or ravine would be tied to, or even a thick undergrowth would be used, to form a link in a fence built to impede access by prospective settlers, or to turn stock which would otherwise drift to the land inside the lines of the barrier so made; or owners of odd-numbered sections of lands acquired by purchase would so construct their fences as to be useless for inclosing their own lands but which were effective in inclosing the even-numbered sections belonging to the government. Such was the case in Camfield v. United States, 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260, where the offenders erected fences near the outside of their own lines on odd-numbered sections, but also immediately outside of even-numbered sections, though in fact a few inches inside their own lines.

As a result of the continuance of such practices, much public land was fenced, and often one who in the best of faith wished to take up a homestead found that immense tracts of what he believed to be the public domain (and which were so in fact) were segregated by some form of fence or barrier. Free access to the public lands was prevented, and the generous invitation to enter upon the unoccupied public lands which had found its expression in the homestead law appeared to mean less than the pioneer had been led to believe it meant. Naturally, fences or strips of fence built as if to separate the lands inside themselves conveyed notice that the lands within were claimed by some right. Often far from a land office or other place where he had a right to go for immediate information, too poor to incur unforeseen expenses and delays, the settler would heed the warning of the fence and go elsewhere in search of open unoccupied domain.

In time, however, dissatisfaction with such unlawful occupancy became widespread in the Western States, and in 1885 Congress, in order to protect the public domain, considered as a remedial measure the law under which the government not only herein, but in many other cases, has proceeded to accomplish the removal or destruction of unlawful inclosures. The history of the act of Congress shows that

on January 12, 1885, the bill was reported for passage with these remarks by the Committee on Public Lands of the Senate:

"The necessity of additional legislation to protect the public domain because of illegal fencing is becoming every day more apparent. Without the least authority, and in open and bold defiance of the rights of the government, large, and oftentimes foreign, corporations deliberately inclose by fences areas of hundreds of thousands of acres, inclosing the avenues of travel and preventing the occupancy by those seeking homes. While those fencing allege the lands within such inclosures are open to settlement, yet no humble settler, with scarcely the means for the necessaries of life, would presume to enter any such inclosure to seek a home.

"The government has sufficient authority to drive those seeking homes from the Indian Territory, and to burn the ranches of those invading the Yellowstone Park, while those appropriating vast areas are hoping the only remedy to be used against them will be the law's delay in the courts.

"Therefore your committee have added a new section to the Army bill, authorizing the President of the United States to summarily remove all obstructions, and, if necessary, to use the military power of the United States."

Thereafter, on February 25, 1885, the act was duly approved. 23 Stat. U. S. 321 (U. S. Comp. Stat. 1901, p. 1524). The first section is as follows:

"That all inclosures of any public lands in any state or territory of the United States, heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation, to any of which land included within the inclosure the person, party, association, or corporation making or controlling the inclosure had no claim or color of title made or acquired in good faith, or an asserted right thereto by or under claim, made in good faith with a view to entry thereof at the proper land office under the general laws of the United States at the time any such inclosure was or shall be made, are hereby declared to be unlawful, and the maintenance, erection, construction, or control of any such inclosure is hereby forbidden and prohibited; and the assertion of a right to the exclusive use and occupancy of any part of the public lands of the United States in any state or any of the territories of the United States, without claim, color of title, or asserted right as above specified as to inclosure, is likewise declared unlawful, and hereby prohibited."

Section 2 makes it the duty of a district attorney in the proper district, on affidavit filed by a citizen that section 1 of the act is being violated, to institute a civil suit in the name of the United States against the parties in charge of or controlling the inclosure complained of. Jurisdiction is conferred upon the United States courts to hear and determine proceedings in equity by writ of injunction to restrain violations of the act. As indicative of the determined purpose of Congress to afford speedy and adequate remedy, it is worthy of remark that section 2 directs that suits brought under the provisions of that section shall have precedence for hearing and trial over other cases on the civil docket of the court, and, in case the inclosure complained of is found to be unlawful, the court is authorized to make proper order for the destruction of the inclosure in a summary way, unless such inclosure shall be removed by the defendant within five days after the order of the court.

Section 3 provides that no person, by force, threats, intimidation, or by any fencing or inclosing or any other unlawful means, shall prevent or obstruct any person from peaceably entering upon or estab-

lishing a settlement or residence on any tract of public land subject to entry under the public land laws; or shall prevent or obstruct free passage or transit from or through the public lands, provided claims in good faith shall not be affected.

Section 4 makes it a misdemeanor to violate the provisions of the act.

Section 5 authorizes the President to take such measures as shall be necessary to remove and destroy any unlawful inclosure of any public lands, and to employ such civil or military force as may be necessary for that purpose.

Executive attention was also specially given to the conditions existing, and President Cleveland on August 9, 1885, issued his proclamation in these words:

"Whereas, public policy demands that the public domain shall be reserved for the occupancy of actual settlers in good faith, and that our people who seek homes upon such domain shall in no wise be prevented by any wrongful interference from the safe and free entry thereon to which they may be entitled; and

"Whereas, to secure and maintain this beneficent policy, a statute was passed by the Congress of the United States on the 25th day of February, in the year 1885, which declared to be unlawful all inclosures of any public lands in any state or territory to any of which land included within said inclosure the person, party, association, or corporation making or controlling such inclosure had no claim or color of title made or acquired in good faith, or an asserted right thereto by or under claim made in good faith with a view to entry thereof at the proper land office; and which statute also prohibited any person, by force, threats, intimidation, or by any fencing or inclosure or other unlawful means, from preventing or obstructing any person from peaceably entering upon or establishing a settlement or residence on any tract of public land subject to settlement or entry under the public land laws of the United States, and from preventing or obstructing free passage and transit over or through the public lands; and

"Whereas it is by the fifth section of said act provided as follows: 'That the President is hereby authorized to take such means as shall be necessary to remove and destroy any unlawful inclosure of any of said lands, and to employ civil or military force as may be necessary for that purpose;'

"And whereas it has been brought to my knowledge that unlawful inclosures, and such as are prohibited by the terms of the aforesaid statute, exist upon the public domain, and that actual legal settlement thereon is prevented and obstructed by such inclosures and by force, threats, and intimidation:

"Now, therefore, I, Grover Cleveland, President of the United States, do hereby order and direct that any and every unlawful inclosure of the public lands maintained by any person, association, or corporation be immediately removed; and I do hereby forbid any person, association, or corporation from preventing or obstructing by means of such inclosures, or by force, threats, or intimidation, any person entitled thereto from peaceably entering upon and establishing a settlement or residence on any part of such public land which is subject to entry and settlement under the laws of the United States."

Now, in the presence of the situation just described, which led up to the consideration of the remedial measure quoted, of the history of the act of Congress, and of the executive action taken after the enactment of the statute, it is very clear to us that the courts should give effect to the broad purpose of the act to prevent unlawful occupancy of the public domain by avoiding a construction which would

narrowly confine the definition of what constitutes an inclosure to cases only where there is literally a complete separation of a tract by means of fences or other barriers in which there are no openings through which settlers and live stock may pass to and fro. The spirit and true intention of the act are inconsistent with such an interpretation; its substance is violated if there be a surrounding of any tract of public land by means of fences or other barriers, or both, which do in a practical way and for all practical purposes withdraw the tract so surrounded from free access by those seeking homes upon the public domain, or from free access by live stock which by acquiescence may graze upon the public range.

[2] We are not at all unmindful of the general right of an owner of a tract of land to build a fence thereon. It is fundamental that the rights of individual proprietorship which carry with them right to inclose or fence one's own land must be carefully guarded; but at the same time, as was held by the Supreme Court in Camfield v. United States, supra, the rights of the government in its proprietorship of the public domain do not exist by the sufferance of individual owners. It has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case. Here the surrounding is in no sense confined to the land of the Golconda Company, for, of the total 37,000 acres included, 26,000 acres are public land. That is to say, the Golconda Company, by maintaining miles of fence along only the outside of its own 11,000 acres and connecting such fences with natural or other barriers, has separated one immense tract consisting not only of 11,000 acres belonging to it, but also of 26,000 acres of public land. The serious significance of the act is even more apparent when we realize that within the barriers there is public land more than sufficient to comprise 162 homestead entries.

The particular argument that the openings which are referred to in the opinion of the District Court as having been made by the cattle company were for the purpose of allowing free use and access for all persons and cattle to the government lands "in the vicinity" of the fences, and that there has been such free use and access, is not persuasive. In a restricted sense this may be true, but in a practical way it does not materially change the situation. For instance, as pointed out by the lower court, from the lane through which passes the road between Tuscarora and Midas there are more than 5½ miles of fence before another opening is reached. Then there is an opening of 100 feet, and then again more than 4 miles of fence, then an opening of 100 feet and 2½ miles more of fence, and so on. At one point a mile and a half of fence, called "North's fence," is in bad repair and down at places. Granted that cattle will sometimes drift, more or less reluctantly, over wire fence which is down, it is nevertheless true that even a fence partly down is a visible tangible barrier, and where there are over 40 miles of fence surrounding an area of public land, with only 8 or 9 narrow openings therein, the fact that in a rocky rough section a mile and a half of the fence is in bad repair and partly down

does not necessarily make the surrounded area any the less inclosed, within the meaning of the statute. Nor does the additional fact that in such a length of fence there is a gap of approximately 3,400 feet, left at the foot of a mountain where the country is rough, necessarily exclude the area surrounded by the fences which lead up to the sides of the rocky gap from the definition of an "inclosure" as meant by the act. It is not enough that a would-be settler can pass through such a gap if he follows along miles of fence and turns in and goes over the rocky place, or that cattle may do likewise, or that they do to some extent enter through and graze upon the lands inside; for the law in forbidding inclosure has not laid down that one kind of barrier and not another may be utilized to separate the public land from the main body thereof. It has not prescribed that to constitute an inclosure there must be substantial fences or any fences around the shut-off tract, or that natural barriers cannot be tied to. Nor has it declared that nothing shall be held to be an inclosure provided there be an opening of any kind by which the public land may be reached, no matter how inaccessible the opening may be or how difficult to go through it when reached. On the contrary, as already indicated, the policy and intent of the statute being that no part of the public domain shall be separated from the body thereof, but shall remain wholly free from inclosure of any kind made by any person or corporation, except where the person or corporation has or asserts claim in good faith with a view to entry, any means whereby there is effected practical separation of public land from the body thereof imposes liability in a suit in equity. The consequences of a contrary view might lead to a practical withdrawal of much public land from the general domain, for, by building miles of fences about public lands but leaving only one or two small openings, and one larger one, in a remote and inaccessible place, one could obtain the benefits of an inclosure, yet say he was not maintaining an inclosure, and so defeat an action to have such an inclosure removed under section 1 of the act.

We have not overlooked the possible applicability of section 3 to such a situation. It is to be said, however, that that section is specially intended to prevent obstructing any person from peaceably entering upon or settling upon the public domain, as well as to prevent obstructing free passage or transit over or through the public lands. The word "fencing," as used in this section, is but the enumeration of one character of means by which obstruction or prevention from entry upon the public lands or free passage over them may be effected. "Inclosing" is also specifically enumerated as another means; so are force, threats, intimidation. But while any fencing or inclosing is declared to be a means of obstruction, the act of maintaining an inclosure of the public land is to be reached by suit under section 1 and not under section 3. It would be correct, for instance, to invoke section 3 as against one who has a piece of drift fence but no inclosure whatsoever, provided such a fence is an obstruction to entry or settlement or prevents free passage over the public lands; and, if one obstructs entry or settlement by an inclosure such as appellant herein had, he could be indicted for violating section 3; but, to have the in-

201 F.—19

closure and its maintenance decreed to be unlawful irrespective of whether or not it is an obstruction as defined by section 3, the government may properly resort to the summary remedy provided by section 1.

Another illustration of how section 3 might be inapplicable is this: A person might go into the roughest isolated mountains, and there without claim of any kind inclose a section of public land. Such an inclosure, however, might not prevent or obstruct any person from peaceably entering upon or establishing a settlement or residence upon the public domain, nor might it prevent free passage over or through the public lands; all because no one would wish to settle upon the inclosed tract or any land near to it or to gain access to any of the public domain within the inclosure or near to it. But under section 1 unquestionably such an inclosure of public land would be unlawful, and, upon complaint made to the district attorney of the proper district, it would be his duty to institute a civil suit against the person controlling the inclosure, and, upon its being found unlawful, it would devolve upon the court to make an order for the destruction of the inclosure in a summary way, unless it should be removed within five days. And indictment would also be proper under section 4.

[3] A word as to the question of intent, to which counsel for appellant has referred: If it were necessary for the court to deduce an intent from the facts, we should have to say that the reasonable inference to be drawn from the situation of the fences and the fact that they were placed as they were is that the appellant intended to maintain an inclosure of public lands. But we do not deem it material to the case. Inclosure of any of the public land, except under bona fide claim of title thereto, is made unlawful by the statute, and as was held by the Court of Appeals of the Eighth Circuit in Camfield v. United States, 66 Fed. 101, 13 C. C. A. 359, it matters not what the intent of the parties may have been in making the inclosure. There are some expressions in the opinion of this court in Potts v. United States, 114 Fed. 52, 51 C. C. A. 678, which seem to consider the intent with which an inclosure upon the public domain has been made as a material element in proving guilt under a criminal charge brought for violation of ·section 3 of the act. But the facts of that case and the section of the statute examined make it distinguishable from the question now before us. In Bircher v. United States, 169 Fed. 589, 95 C. C. A. 87, this court held that under an indictment under section 1 of the act the test of criminality is "whether the person who committed the act had, at the time of committing it, color or claim of title, or asserted right under the land laws." The court said of the act:

"It makes punishable the act of unlawfully inclosing the government lands, and it makes punishable the act of unlawfully maintaining·an inclosure, whether the person maintaining the same was the person who erected it, or whether, at the time when it was erected, it was erected with or without authority of law."

In Homer v. United States, 185 Fed. 741, 108 C. C. A. 79, the Court of Appeals of the Eighth Circuit reaffirmed its opinion in the Camfield Case, supra, by expressly deciding that one's intent in build-

ing a fence is immaterial if in fact it incloses public land. The court goes on to distinguish carefully what was before the Supreme Court when the Camfield Case, supra, was considered on appeal (Camfield v. United States, 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260), and concludes that the opinion by Justice Brown, when taken as a whole and construed with relation to the issues before the court, necessarily was that building a fence on one's own land without an intention of including lands of the United States was no defense, if in fact the lands involved were actually inclosed. In Hanley v. United States, 186 Fed. 711, 108 C. C. A. 581, the question of necessity for intent seems not to have been directly involved.

[4] It is said that enforcement of the decree of the District Court may be an invasion of the constitutional rights of the appellant, in that it would constitute a taking of private property for public use. But under the doctrine laid down by the Supreme Court in the Camfield Case, supra, the United States has a clear right to legislate for the protection of the public lands and to exercise what is called a police power to make the protection effective, even though there may be some inconvenience or slight damage to individual proprietors. There being nothing in the facts of this case to take it out of this rule, we must hold that no rights of appellant have been infringed.

The order appealed from is affirmed.