GOLCONDA CATTLE CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. April 6, 1914.)

No. 2143.

PUBLIC LANDS (§ 19*)—"UNLAWFUL INCLOSURE OF PUBLIC LANDS"—SUIT FOR INJUNCTION.

Defendant cattle company constructed and maintained a fence about 40 miles long around 37,000 acres of land, 26,000 acres of which was public land. The remainder was mostly owned by defendant and practically surrounded that owned by the government. The fence was built entirely on such land, no part of it being on the government land, and there were nine openings in it, varying from 90 to 3,400 feet in length. It appeared

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

from the evidence that the fence was not built with any intent to in-close the government land, nor to exclude the public from entering upon it for purposes of settlement, grazing, or other uses, but for the bona fide protection of defendant's own lands. *Held* that, under such facts, the fence did not constitute an "unlawful inclosure of public lands," within the meaning and intent of Act Feb. 25, 1885, c. 149, § 1, 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), and the United States was not entitled to an injunction to restrain its maintenance under section 2 of the act.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26 ; Dec. Dig. § 19.*]

Hunt, Circuit Judge, dissenting.

On rehearing. Reversed.

For former opinion, see 201 Fed. 281, 119 C. C. A. 519.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. Our former decision in this case is reported in 201 Fed. 281, 119 C. C. A. 519. A rehearing was granted, and after its reargument, and a very careful reconsideration of the record, we are convinced that in two respects indicated in the former opinion the court was in error—one as to a matter of fact and the other of law. In regard to the latter, it was said in the opinion—following the decision of the Circuit Court of Appeals of the Eighth Circuit in the case of Homer v. United States, 185 Fed. 741, 108 C. C. A. 79—that the question of intent with which the fencing was done could not be considered by the court. A reconsideration of that question satisfies us that this court had held the reverse in the cases of Potts v. United States, 114 Fed. 52, 51 C. C. A. 678, and Hanley ·v. United States, 186 Fed. 711, 108 C. C. A. 581, and that the Supreme Court so held in the case of Camfield v. United States, 167 U. S. 528, 17 Sup. Ct. 864, 42 L. Ed. 260. In the opinion in the case of Homer v. United States, supra, from which Judge Van Devanter, now a Justice of the Supreme Court, dis-sented, the court said:

"The Camfield Case was heard on an exception to defendant's answer to the effect that said answer did not state facts sufficient to constitute a de-fense to the bill. The answer sought to justify the erection of the fence in that case on the ground that defendants owned all the odd-numbered sec-tions upon which the fence was built, and that they were engaged in build-ing large reservoirs for the purpose of irrigating the land by them owned. They also denied that they had any intention of monopolizing the even-num-bered sections or to exclude the public therefrom. With these allegations in the answer, this court affirmed the judgment of the Circuit Court abating the fence, and the Supreme Court, in affirming the judgment of this court, neces-sarily decided that building a fence on one's own land without an intention of inclosing lands of the United States was no defense, if in fact the lands mentioned were actually inclosed."

Turning to the case of Camfield v. United States, 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260, it is seen that the bill averred in substance that the defendants, with intent to encroach and intrude upon the lands of the United States in an illegal manner, and to monopolize the use of the same for their own special benefit, did, on`or about the 1st of Jan-uary, 1893, construct and maintain a fence which inclosed and in-

cluded about 20,000 acres of the public domain; that the effect of such inclosure was to exclude the United States and all other persons except the defendants therefrom; and that the lands thus wrongfully inclosed consisted of all of the even-numbered sections in townships numbered 7 and 8 north of range 63 west of the sixth principal meridian. The bill further averred that said townships 7 and 8 lie within the limits of the grant made by the government to the Union Pacific Railroad Company; that the defendants had acquired from that railroad company the right to use all the odd-numbered sections of land which lie within the said townships 7 and 8 and outside thereof, immediately adjacent to the even-numbered sections lying within and on the margin of said townships, and that in building the fence complained of the defendants had constructed it entirely on the odd-numbered sections, either within or without townships 7 and 8, so as to completely inclose all of the government lands aforesaid, but without locating the fence on any part of the public domain so included. The defendants by the answer admitted that they had constructed a fence so as to inclose all of the even-numbered sections in townships 7 and 8 substantially as set out in the bill, save and except that at each section line a swinging gate had been placed to afford access to so much of the public domain as was inclosed by the aforesaid fence, and by their answer sought, among other things, to justify the erection of the fence in question upon the ground that they owned all the odd-numbered sections in townships 7 and 8, and they denied that they had any intention of monopolizing the even-numbered sections inclosed by said fence, or to exclude the public therefrom.

An exception to the answer upon the ground that it was insufficient to constitute a defense to the bill was sustained by both the trial and the Supreme Court. The latter, after setting out the provisions of the statute of February 25, 1885, entitled "An act to prevent unlawful occupancy of the public lands," 23 Stat. 321, the construction and application of which were involved, said:

"Defendants are certainly within the letter of this statute. They did inclose public lands of the United States to the amount of 20,000 acres, and there is nothing tending to show that they had any claim or color of title to the same, or any asserted right thereto under a claim made in good faith under the general laws of the United States. The defense is in substance that, if the act be construed so as to apply to fences upon private property, it is unconstitutional."

And, after referring to the general proposition that a man may do what he will with his own, and pointing out that that right will not justify him in maintaining a nuisance, or in carrying on a business or trade that is offensive to his neighbors, proceeded as follows:

"While the lands in question are all within the state of Colorado, the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers. It may deal with such lands precisely as a private individual may deal with his farming property. * * * It needs no argument to show that the building of fences upon public lands with intent to inclose them for private use would be a mere trespass, and that such fences might be abated by the officers of the government or by the ordinary processes of courts of justice. To this extent no legislation was necessary to vindicate the rights of the government as a landed proprietor. But the evil of permitting persons, who owned or con-

trolled the alternate sections, to inclose the entire tract, and thus to exclude or frighten off intending settlers, finally became so great that Congress passed the act of February 25, 1885, forbidding all inclosures of public lands, and authorizing the abatement of the fences. If the act be construed as applying only to fences actually erected upon public lands, it was manifestly unnecessary, since the government as an ordinary proprietor would have the right to prosecute for such a trespass. It is only by treating it as prohibiting all 'inclosures' of public lands, by whatever means, that the act becomes of any avail. The device to which defendants resorted was certainly an ingenious one, but it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute. So far as the fences were erected near the outside line of the odd-numbered sections, there can be no objection to them; but so far as they were erected immediately outside the even-numbered sections, they are manifestly intended to inclose the government's lands, though in fact erected a few inches inside the defendants' line. Considering the obvious purpose of this structure, and the necessities of preventing the inclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual. * * * The government has the same right to insist upon its proprietorship of the even-numbered sections that an individual has to claim the odd sections, and if such proprietor would have the right to complain of the government fencing in his lands in the manner indicated and leasing them for pasturage, the government has the same right to complain of a similar action upon his part. * * * These grants were made in pursuance of the settled policy of the government to reserve to itself the even-numbered sections for sale at an increased price; and if the defendants in this case chose to assume the risk of purchasing the odd-numbered sections of the railroad company for pasturage purposes, without also purchasing or obtaining the consent of the government to use the even-numbered sections, and thereby failed to derive a benefit from the odd-numbered ones, they must call upon their own indiscretion to answer for their mistake. The law and the practice of the government were perfectly well settled, and if it had chosen in the past to permit by tacit acquiescence the pasturage of its public lands, it was a policy which it might change at any moment, and which became the subject of such abuses that Congress finally felt itself compelled to pass the act of February 25, 1885, and thereby put an end to them. It was not intended, however, to prohibit altogether the pasturage of public lands, or to reverse the former practice of the government in that particular. Indeed, we know of no reason why the policy, so long tolerated, of permitting the public lands to be pastured may not be still pursued, provided herdsmen be employed, or other means adopted by which the fencing in and the exclusive appropriation of such land shall be avoided. The defendants were bound to know that the sections they purchased of the railway company could only be used by them in subordination to the right of the government to dispose of the alternate sections as it seemed best, regardless of any inconvenience or loss to them, and were bound to avoid obstructing or embarrassing it in such disposition. If practices of this kind were tolerated, it would be but a step further to claim that the defendants, by long acquiescence of the government in their appropriation of public lands, had acquired a title to them as against every one except the government, and perhaps even against the government itself. * * * So long as the individual proprietor confines his inclosures to his own land, the government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it, regardless of any detriment to his neighbor; but when, under the guise of inclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to inclose the lands of the government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large."

In deciding the Camfield Case, the Supreme Court manifestly, we think, took into consideration the intent with which the defendant to

that action erected the fences there in question, for the court, after setting out specifically how and where they were erected, including a diagram thereof, said:

"The device to which defendants resorted was certainly an ingenious one, but it is too clearly an evasion to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute. So far as the fences were erected near the outside line of the odd-numbered sections, there can be no objection to them; but so far as they were erected immediately outside the even-numbered sections, they are manifestly intended to inclose the government's lands, though, in fact, erected a few inches inside the defendants' line. Considering the obvious purpose of this structure, and the necessities of preventing the inclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual."

And the court concluded with the declaration that:

"So long as the individual proprietor confines his inclosure to his own land, the government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it, regardless of any detriment to his neighbor; but when, under the guise of inclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to inclose the lands of the government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large."

So in the case of Hanley v. United States, 186 Fed. 711, 108 C. C. A. 581, this court sustained an instruction given to the jury by the trial court, holding it to have stated the law fairly in respect to the point there referred to, which instruction is as follows:

"It is sufficient, within the intendment of the statute, that the inclosure comprising any of such public lands was designed and intended by the person or individual constructing or maintaining the same to hinder or impede the ordinary ranging of stock, or its natural and free ingress from without, or egress from within, or is reasonably calculated in the manner of its construction or maintenance to accomplish a like result, or which serves to exclude or to hinder or impede other persons or the public from free and unrestrained access to and upon the lands so inclosed for the purposes for which any individual has the right of access to public lands. Nor is it essential that the person so constructing or maintaining the inclosure shall do so by fencing entirely his own, but he may accomplish the result by joining his fencing to that of others, so as to make the barrier complete, or he may conjoin his fence to natural barriers, such as ledges of rock, precipitous bluffs, steep declivities, or mountain ranges, or other natural obstructions, not readily passable, or which in their practical effect would impede or interrupt the ordinary ranging of stock, or which, together with the fencing, would prevent, obstruct, or impede in some measure the more natural and free passage of persons and individuals to and upon the public lands so inclosed. There is no controversy here as to the lands described in the indictment being a part of the public domain, and the defendant lays no claim to any of such lands, by entry or otherwise, with a view to their acquirement from the general government; so that these two elements of the offense charged may be taken as proven. The case, therefore, turns wholly upon the question whether the defendant maintained or controlled fences which, being joined onto the rim rock, constituted an inclosure as defined of such public lands. The government has described what fencing and rim rock or other natural barriers constitute the inclosure complained of, by setting forth the beginning and ending point, and the courses and distances thereof, and it is thereby confined in its proof to the establishment of such an inclosure as is alleged. * * * The intent or purpose with which fencing or an inclosure was constructed or maintained, if

so constructed or maintained, may be gathered from all the testimony showing the local conditions and environment, the ownership or want of ownership of the lands affected by the inclosure, their occupancy, and the use of which they are susceptible. Men do not build fences, or construct or maintain inclosures, except for a purpose. That purpose is usually manifest. It is to control in some degree at least the use or the manner of use and occupancy of the lands or premises inclosed. Indeed, an inclosure is the assertion of a claim of some right or title to the premises inclosed, and it operates as a notice to others of such claim. Nor does it affect such assertion of claim and notice that gates and bars that may be opened and closed are provided at convenient intervals in such fencing. These are primarily constructed for the use and convenience of the proprietor of the fencing, and usually only for others and the public when placed upon private easements or public highways. So that ordinarily any person breaking the close, or going upon the lands and premises inclosed for occupancy, or taking his stock thereon for pasturage, would be accounted a trespasser, a violator of private rights, or even a wrongdoer in a criminal sense; and thus is demonstrated the deterrent effect the maintenance of an inclosure about public lands will have upon those desirous of entering thereon for any purpose.

"A person has a right, under the law, to erect fences wholly upon his own land, and to maintain them, if he so desires, and if incidentally such fences may obstruct or impede the ingress or egress of stock ranging upon the public lands, or the free passage of persons upon or over such lands, no one can complain, because a man has a right to do what he pleases with his own, so long as he does no willful injury to another. But he cannot make the construction of fencing upon his own lands a subterfuge for inclosing or preventing free passage upon the public lands. To make plain to you what I mean, I will allude to some of the facts as they appear in this case. The Harney Valley Development Company owns the narrow strip of land, consisting of 40-acre tracts, by legal subdivisions joining one upon another in continuous succession, running from Fish creek north 12¼ miles to the vicinity of the North fork of Little Krumbo creek, thence east about 2¾ miles, thence north 2½ miles, and thence east 2 miles, more or less, to a junction with the rim rock at McCoy creek, and another strip of like character running from Blitzen river west about 7¾ miles to a little beyond the road to Roaring Springs. Upon these narrow strips of land has been constructed but a single line of fencing for their entire length, which, if conjoined upon the rim rock described, with barriers constructed in the draws of the rim rock, serves, with other fencing upon the north, to inclose 80,000 acres of the public lands. The lands comprised by the narrow strips are in very large proportion practically valueless for any purpose, except for grazing. Now, if title to these strips of land was acquired and the fences were constructed thereon as a subterfuge or pretext, so that it could be said that the fences were constructed entirely upon private lands, the device could not avail the owner. The inclosure yet would be an inclosure of public lands within the inhibition of the statute. So a maintenance of such fence is likewise inhibited by the statute.

"You are the judges of the purpose for which this fencing was constructed in the first place, whether to inclose public lands or not; and, if so, whether it was maintained by the defendant as alleged in the indictment; and, if so, for what purpose."

And, as said by Judge Van Devanter in his dissenting opinion in Homer v. United States, supra, the case of Potts v. United States, 114 Fed. 52, 51 C. C. A. 678, decided by this court, is in principle to the same effect.

The evidence in the present case shows, we think, that such fences as the appellant company built upon its own lands were not constructed with any intent to inclose any government land, or to exclude the public from entering upon the public domain, either for purposes of set-

tlement, grazing, or other uses, but were for the bona fide protection of its own lands, extensive portions of which it had planted to various agricultural crops in connection with its stock business; and such was, in effect, the finding of the trial court. While those fences were very extensive, amounting in the aggregate to about 40 miles in length, various openings were left in them at points most frequently used by cattle and other animals in their passage to and from the grazing lands of the United States, and at points at which the public highways entered and left the appellants' lands, which openings were nine in number, the widest of which was 3,400 feet in width, and the narrowest 90 feet; others being as much as 120 and 312 feet in width. Such openings, in view of the situation and condition of the lands of the government and of the cattle company as disclosed by the evidence, in our opinion admitted of reasonable access by the public to the public domain, for which reason the fences in question cannot be properly held to unlawfully inclose the lands of the United States.

It results from the above views that the order appealed from must be and hereby is reversed.

HUNT, Circuit Judge (dissenting). Upon the rehearing it was argued by appellant that in addition to the outside there were some inside fences upon appellant's lands, and that appellant did not intend to give the court to understand that the fences maintained by it were *only* upon the outside of its lands. Inasmuch as the closest precision should control in arriving at the physical situation, the language of the former opinion should have referred to the fences maintained by appellant as situated not "only" upon the outside of appellant's lands, but also as in part upon the inside of certain fields of appellant's lands. The point, as I view it, is not of special importance; but it should, of course, be made clear that there were some inside fences which served to inclose certain portions of the appellant's lands.

To make clearer the meaning of what I may say, I annex a reduced copy of the plat used in evidence before the lower court. The heavy shaded lines (purple on the original map) do not show openings found by the lower court to have existed at the time of the filing of the bill, but were intended to represent where additional openings would have to be made by the defendant company under the order of the lower court.

In the south half of section 33, township 40 north, range 48 east, some inside fences were built, so as to inclose a field of about 120 acres. A fence had also been constructed in the southwestern portion of the tract from opening No. 1, running easterly through part of section 33, township 39 north, range 47 west; thence in a southerly direction to a point in section 4, township 38 north, range 47 east; thence easterly to a point in section 2, same township, described in the opinion of the court below as opening No. 8, 100 feet wide—this opening having been made in June, 1911, so that with the outside fence which joined to the fence just described at openings No. 1 and No. 8, a field of approximately 2,500 acres of the company's land was inclosed.

Some inside fences also had been built about a reservoir maintained

by the company down toward the southern part of the tract. The testimony as to the fences about the reservoir is hard to apply to the map, inasmuch as the witness who explained the situation pointed to the map used at the hearing before the District Court, without describing with certainty the particular place to which he was pointing. I quote from his testimony as follows:

"Q. Then the only complete inclosure of Golconda Cattle Company land about which you know anything is that land near the so-called reservoir, as indicated upon the plat, and beginning at a point approximately in section 29— A. No. Q. Where does it begin? A. At this lane. Q. Beginning at a point in section 28? A. I think probably it did. Q. Approximately section 28, and ending at what point? A. Well, my survey, I had Mr. Taylor survey, my point commenced here; they was constructing this fence when I left the Golconda Cattle Company. Q. You were engaged in constructing that fence, and it was your intention to run it to a point somewhere in section 36?

"The Court: That includes the reservoir, does it not—the one you are speaking of?

"Mr. Platt: Yes."

I gather from the testimony that prior to the filing of the bill there was an inside fence built in the southern part of the tract, which, with the outside fence, practically inclosed a strip of land about four miles long belonging to the Golconda Cattle Company. It is very difficult to determine whether or not there were fences which completely encircled the reservoir referred to by the witnesses. Osborne, who had been foreman of appellant before July 1, 1911, was asked about a fence from a point marked "Gap" down to opening No. 6, encircling the reservoir. His reply was to the effect that a fence did encircle the reservoir and the flat above it and below it.

Counsel for the appellant lay stress upon the fact that west of a fence described in the bill as running from a point in section 21, township 39 north, range 47 west, in a southwesterly direction to a point described as opening No. 1, there was an inclosure of a field of about 1,600 acres, all belonging to the defendant company. But as this field is outside of the issues here in controversy, reference to it is merely helpful to a better understanding of the general situation of the tract directly involved and the fences thereon or thereabouts. The case cannot be affected by the fact that the company tied to one side of an inclosed tract belonging to it, if the fence on one side of such tract is shown to have been used as a link in a chain of fencing which operated to make an inclosure of the whole tract involved.

Special point is made with respect to opening No. 6 in the fence, about 3,400 feet, which was found by the lower court to be favorably and conveniently located for the passage of cattle drifting toward Rock Creek Mountains. It is said that this court misunderstood the exact character of this opening and of the country about it. I would not disturb the findings of the lower court as to the favorable and convenient location of gap No. 6 for the passage of cattle drifting toward Rock Creek Mountains, nor did we misplace the opening. The whole country in the vicinity of this gap, which is toward the foot of the mountains, where the country is rough, is hilly, although at the opening itself, and to the south of it, there is a little valley, with a ravine

near the point of the opening. Into this little valley cattle drift from the south and the east and may pass toward Rock Creek Mountains.

As to North's fence, referred to in the original opinion, the testimony sustains the expressions of the opinion, which I believe are in accord with the findings of the lower court and the evidence in the record.

It is argued that the evidence pertaining to the nature of the country shown upon the northeastern portion of the map was misunderstood. The evidence is clear, however, that the country in that immediate section is mountainous, rough, and broken. The witness Sheehan, called by the defendant, said he would call it a mountainous country. A witness named De Lano said it was much rougher up in this section than lower down; that it was a mountainous country, while the government's lands lying below might be called a foot hill country. The evidence shows that cattle drifted toward this mountain country in the summer time; but if the practical effect of maintaining fences up to the roughest parts of the country was, in conjunction with the rough country itself, to prevent free ingress and egress to and from the public lands lying in the foot hills southwest of Toejam Mountain, I think that the law of the case as discussed in the original opinion should control. The witness McClellan, when asked by the court whether the top of the ridge on the northeastern corner of the map was smooth, answered:

"Yes, sir; smooth. Of course, there are rocks there, a rocky ridge."

He was then asked whether it would be passable for wagons. His answer was:

"Well, it is pretty steep. I suppose a person, if they had teams enough, could pull up the ridge; but it is a tolerably steep ridge to get up from the creek up there. By starting out lower down, out on Siawappe creek, you might say about a mile to the southwest of the Nelson fence, you may work up there and get on top of that bench, and then follow the ridge right up and strike Willow creek below there, and work up this bench land, and go right up there until you strike the mountain; that is, about four miles east of the land shown on this plat."

Again this witness referred to one of the markings of barriers as a point where the canyon is narrow, with a pretty steep rocky bluff to go down to get on the creek from the south.

Flocker, special agent of the Land Office, said that from the end of the red line shown upon the map [here shown as a heavy black line] at the south of Toejam Mountain to North's fence there was a barrier, although it might be possible at one or two places to get over the barrier between that and the other fence. He described the barrier as an outcrop of rim rock, not very high in places and not very good as a barrier in places, saying that the barrier is not absolutely impassable; that cows and calves could get through, but the tendency would be for them not to go through. He had never been right up to the barrier itself, but had seen it from further down.

Upon the argument on the rehearing counsel dwelt upon the fact that the testimony showed that there was a road from below the reservoir toward Tuscarora, and that this road passed out toward Tuscarora

through the 300-foot opening designated as No. A, which is up toward the foot hills of Toejam Mountain. The evidence is very meager concerning this road, but it would appear as though it started on Willow creek below the reservoir and ran in a northeasterly direction over the government land to the point of exit already referred to. Whether or not it was in use does not appear. It also appears from the testimony of Osborne that there is another road to Tuscarora which comes from the "Tie Corral country" and passes the 3,400-foot opening, No. 6; but there is nothing definite concerning the character or location of this road. Nor is it shown that it was in use.

Flocker visited the tract found to be an inclosure on September 7, 8, and 9, 1910, again on April 10 and 11, 1911, and a third time on July 22 and 23, 1911. The bill was filed May 31, 1911. On his April visit he said he saw only four openings (in addition to three gates) in the entire inclosure, but in July he found several other openings which were not there on the first two visits. Osborne said he made openings No. 3 and No. 8 in June, 1911, upon orders from the president of the company, through one Petrie, who succeeded Osborne. The witness Willis, chairman of the board of county commissioners of Elko county, testified as to conversations he had had with Osborne respecting obstructions by the defendant company of the public roads with their fences. While it is true much of the testimony of Willis came in over objection, some of it being rejected by the lower court, I think sufficient appears to warrant the inference that the cattle company had notice in 1910 that their fences were obstructing free use of the road from Tuscarora to Midas.

When asked as to the purpose of the fence as shown on the map, Osborne said the object was not to keep anything out or anything in, but "one was to steer cattle up to the mountain, and the other purpose was the company's intention of fencing their own lands." Counsel for appellant say in their brief:

"The company was also engaged in the stock business, and it naturally desired, during the period of development of its properties, and prior to completely fencing them, to get the utmost good it could out of its rich creek bottoms. It hence placed its fences along the outside of these lands first before filling in the entire interior boundary line and completing the inclosure of the balance of the bottoms. These inclosures along the outside of its property performed the double purpose of confining the cattle to the grassy bottoms and steering them, as they drifted from lower to higher territory in the springtime, according to the universal custom of cattle in arid countries, up toward the rich, high, mountainous feeding grounds beyond the headwaters of the two creeks."

Conceding that the cattle which were inside the fences would be free to drift over the public lands up into the more mountainous section, where the summer feed is good, it is nevertheless clear that, if the fences would directly tend to confine cattle and to steer them as they drift, so would such fences directly tend to exclude cattle not on the inside. It is true, too, that some other cattle besides those belonging to appellant grazed upon the public land inside the fences, but in one instance such common use was under an agreement with another cattle company. In 1910 some bands of sheep were driven through.

It is earnestly urged that the fences built were but a part of a proposed scheme of inclosing all of the defendant's lands and that the construction was going on when the bill was filed. Osborne testified that all the company's lands were surveyed "to find out where such and such lands" were, that the surveying was all done in connection with the fencing, and that:

"It was the calculation of the Golconda Cattle Company, when they made them surveys, to fence all of their lands that was practical, in this here country, and any land they surveyed to make them into fields; to fence both sides of their land. I had orders from the Golconda Cattle Company to that effect."

He also said they had the posts and wire at Dutton ranch to make a field of the land running from a point near the letters "T 39 N R 47 E" on the map around to North's fence; that he bought that wire about two years ago; that his orders were to "fence the fields, from 40 to 5,000 acres of the company's land, to entirely close it"; that these fencing operations had gone on for four years while he was with the company, commencing in 1909, down to July 1, 1911, when he left the company; and that altogether he built somewhere near 11 miles of inside fencing. Of this inside fencing, that portion from opening No 1 to opening No. 8, about 3½ miles, was constructed after September 1910, and before April, 1911. The fence from opening No. 7 to opening No. 6 in the southern portion of the map, about 4 miles long, Osborne says he ordered built in April, 1911, though he hauled material up to build it in the fall of 1910. This fence has been referred to as an inside fence, but as a matter of fact, if the plat is correct, it is nearer the outside than the inside of the company's land. This fence and that around the reservoir (the record is not clear as to this) seem to have been in process of construction when the bill was filed, and had not been completed on July 1, 1911, when Osborne left the employ of the company. Just when the fence in the lower half of section 33 (around the 120-acre field) was constructed does not appear. The fence from opening No. 1 up to the figures "21," the east fence of the field of 1,600 acres of company land, Osborne says was built in 1909. While there is company land between this fence and the public lands, about 200 acres, judging it roughly from the plat, this is included in the fences denominated "inside" by appellant. Excepting this fence, then, and the fence on the inside of the 120-acre field in the south half of section 33, all of the inside fences were constructed after the special agent of the Land Office made his first inspection of the inclosure. This circumstance is of moment as bearing upon the weight to be attached to the statements of Osborne to the effect that the company was proceeding to inclose all of its own lands.

We may assume, however, that appellant was proceeding to inclose all of its own lands, and that it intended to build inside fences with diligence; still, considering the fences with the natural barriers in the northeast, the nine openings found by the District Court to have been present when the bill was filed were in number and kind not sufficient to exclude the case from the statute.

In a most earnest effort to reach a correct solution of the rights of

214 F.—58

the parties, I have gone over the record with great care; and while the testimony of the witnesses is not always easy to apply to the plats in evidence, yet I think the findings of the District Court are well sustained and must be accepted as correct.

It would be reiteration to discuss the law. My interpretation of the statute involved is that, if an inclosure exists, the one who erects or maintains it violates the law, and injunction will run against him, without regard to his intent. Any other construction, it seems to me opens the way for mischiefs which the statute specially aimed to prevent. Moreover, the form of the decree of the lower court seems to have been based upon a determination to receive such further evidence as will assure free access to the public domain lying within the inclosure, and yet do so with due regard for the property rights of the appellant.

I would reaffirm, and so allow the case to go back to the District Court for further equitable orders.