UNITED STATES of America, ex rel. Brent BERGEN and John Ernst, Plaintiff,

and

Wyoming Wildlife Federation, a Wyoming non-profit corporation, and National Wildlife Federation, District of Columbia non-profit corporation, Plaintiff-Intervenors.

v.

Taylor LAWRENCE, d/b/a Grizzly and Daley Ranch, Defendant,

No. C85–0136–B.

United States District Court, D. Wyoming.

Nov. 1, 1985.

Richard A. Stacy, U.S. Atty. (on briefs), Francis L. Pico, Asst. U.S. Atty., D. Wyo., Cheyenne, Wyo., and Georgina Guy, Regional Sol., U.S. Dept. of the Interior, Denver, Colo. (on briefs), for U.S.

Thomas D. Lustig, Boulder, Colo., and Rodger McDaniel, Cheyenne, Wyo., for plaintiff-intervenors.

Clyde O. Martz, Davis, Graham & Stubbs, Denver, Colo., and John A. MacPherson, Johnson, MacPherson & Noecker, Rawlins, Wyo. (on briefs), for defendant.

## MEMORANDUM OPINION

BRIMMER, Chief Judge.

This case arises from the contentions of the United States and plaintiff-intervenors Wyoming Wildlife Federation and National Wildlife Federation (Wildlife Federations), that defendant has wrongfully fenced in federal land in violation of the Unlawful Inclosures of Public Lands Act, 43 U.S.C. §§ 1061–1066. At the hearing on plaintiff-intervenors' motion for preliminary injunction, with the agreement of counsel, the Court consolidated the matter into a full hearing on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

At the conclusion of the evidence and final arguments, the Court concluded that the Wildlife Federations upheld their burden of proof both for the preliminary injunction and upon the merits of the case, and orally granted their motion and ordered defendant to take down certain portions of the fence within ten days, and modify or remove the entire fence within sixty days. In order to ensure removal of the portions of the fence necessary to avoid a disaster to the antelope herd in case of an early onset of winter weather, the Court issued a written Order Granting Motion for Preliminary Injunction on October 29, 1985, setting that date as the beginning of the ten day period. This memorandum opinion now confirms the oral Order and Order on Preliminary Injunction, and more fully sets out the reasoning of the Court.

Defendant owns a cattle ranch in the vicinity of Rawlins, Wyoming, and in the spring and summer months for about 60 days grazes his cattle on a combination of private, federal and state lands in the area of south central Wyoming known as Red Rim. Red Rim is an escarpment and uplifting plateau of approximately 22,000 acres, fifteen miles southwest of Rawlins, Wyoming, which lies just south of the railroad right-of-way granted to the Union Pacific Railroad in 1862. Red Rim contains an abundance of Wyoming big sagebrush, which, as testified to by Mr. Moody and Dr. Alldredge, is not eaten by cattle, but constitutes the major part of an antelope's diet, especially during winter. Due to Red Rim's geological features, winter winds blow the snow off this sagebrush, allowing the antelope to find food here when their other grazing areas are covered over with deep snow. The Wyoming Game and Fish Department has declared that portions of Red Rim constitute critical winter habitat for pronghorn antelope. *See* plaintiff-intervenors' exhibit number 11. The Baggs antelope herd which uses Red Rim for winter range is estimated to number 2,000 or more, and those 2,000 antelope have virtually no other alternative winter feeding grounds.

Red Rim, and defendant's Daley Ranch, are the legacy of a checkerboard ownership plan arising from the Union Pacific Railroad Act of July 1, 1862, c. 120, 12 Stat. 489, 492(3) and (4), *as amended* by Act of July 2, 1864, c. 216, 13 Stat. 356, 358(4). Pursuant to the Union Pacific Act, Congress transferred fee ownership of odd-numbered sections of land along the railroad lines to the Union Pacific, and retained Federal ownership in the even-numbered sections. Defendant now has fee title or permission to fence from the title owner, to the Union Pacific sections in question, and has grazing permits on the

odd-numbered federal and state sections. Defendant's fence, which covers 28 miles, is physically located on private land, except where it crosses at the common corners of state and federal sections, as shown on the attached diagram. (Stipulation Finding # 14)

The matter in issue is quite simple. Defendant Lawrence contends that since the fence is located on his land, and that he can construct it in any manner he chooses, without having to comply with Bureau of Land Management (BLM) requirements. Plaintiff-intervenors counter that since the fence encloses public lands, it violates the Unlawful Inclosures Act, unless the fence conforms with BLM standards promulgated pursuant to the Taylor Grazing Act, 43 U.S.C. § 315 et seq. Those BLM standards require that fences for cattle operations provide a gap of at least sixteen inches at the bottom, with a bottom strand of smooth wire, so that antelope can crawl underneath, and with a top wire only thirty-eight inches high, to allow antelope to jump the fence when snow drifts block passage beneath the bottom strand. Defendant's fence on the other hand, is made of woven wire with no gap at the bottom, and is topped off with barbed wire at a height of five feet, making it, as defendant admits, antelope-proof. Joint Stipulation number 14 and Exhibit B.

In 1897 the United States Supreme Court dealt with an identical situation in *Camfield v. United States*, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed.2d 260 (1897). Camfield acquired from Union Pacific the rights to several odd-numbered private sections of land, and

> in building the fence complained of, the defendants had constructed it entirely on odd-numbered sections ... so as to completely enclose all of the government lands aforesaid, but without locating the fence on any part of the public domain so included. *Id.* at 519, 17 S.Ct. at 864.

The Supreme Court considered Camfield's argument that he could do whatever he wished on his own land, and soundly rejected it. The Court found that the Unlawful Inclosures Act had been promulgated just to avoid such an outcome.

> If the act be construed as applying only to fences actually erected upon public lands, it was manifestly unnecessary, since the Government as an ordinary proprietor would have the right to prosecute for such a trespass. It is only by treating it as prohibiting all "enclosures" of public lands, by whatever means, that the act becomes of any avail. *Id.* at 525, 17 S.Ct. at 867.

Finally, the Court concluded that defendant's intent, whether to irrigate the public lands or use them for pasturage, was unimportant. The only matter at issue was whether or not the fence violated the statute.

> The device to which defendants resorted was certainly an ingenious one, but it is too clearly an envasion (sic) to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute.... Considering the obvious purposes of this structure, and the necessities of preventing the enclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual. *Camfield* at 525, 17 S.Ct. at 867.

The situation in this matter is virtually identical to that dealt with by the Supreme Court in *Camfield*. Although written in 1897, *Camfield* is still good law, and in fact was relied upon by the Supreme Court as recently as 1983 in *North Dakota v. United States*, 460 U.S. 300, 319, 103 S.Ct. 1095, 1106, 75 L.Ed.2d 77 (1983). While the defendant relies on four major arguments in an attempt to distinguish *Camfield*, the Court is convinced that none of these arguments take the facts of this case beyond the scope of *Camfield*.

▮ Defendant first contends that *Camfield* is inapplicable because *Camfield* relies for its holding on the Unlawful Inclosures Act, (UIA), 43 U.S.C. § 1061 et seq.,

contends that the UIA does not apply to antelope. The portion of the UIA which is at issue here reads as follows:

§ 1063. **Obstruction of settlement on or transit over public lands.** No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct, or shall combine and confederate with others to prevent or obstruct, any person from peaceably entering upon or establishing a settlement or residence on any tract of public land subject to settlement or entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands: **Provided,** This section shall not be held to affect the right or title of persons, who have gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith.

Because the UIA says no person shall "prevent or obstruct any person", defendant says that the act only applies to humans, and that it is permissible for him to prevent antelope from crossing his fence. This argument might be valid except for the second clause of § 1063, which continues "or shall prevent or obstruct free passage or transit over or through the public lands." That clause does not contain the word "person", and neither does the Court believe that "person" from the preceding clause should be read into it. Had Congress intended only to protect people, the first clause would have accomplished that purpose without necessity of the second clause.

In *Mackay v. Uinta Development Co.,* 219 F. 116 (1914), a Wyoming case decided by the Eighth Circuit Court of Appeals before the Tenth Circuit was created, the court held that there must be reasonable access for livestock to reach enclosed federal lands. Moreover, in *Stoddard v. United States,* 214 F. 566 (8th Cir.1914), the Eighth Circuit specifically rejected the argument that defendant now presses this Court to embrace. In holding that the UIA did not apply only to humans, the Court held that the act

was intended to prevent the obstruction of free passage or transit for any or all lawful purposes over public lands. *Id.* at 568–69.

Surely, the free passage of hunters and their quarry is a lawful purpose for which the public may seek access to public lands. In light of these precedents the Court is hardpressed to understand how the UIA could apply to cattle, but not to antelope. In the words of the *Stoddard* Court, "[w]e think this is a forced and unwarrantable construction of the language employed." *Stoddard* at 568.

In the years since the 1885 passage of the UIA, the then-pressing concerns of settlement and range wars have faded. But, new present-day concerns have arisen. In the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., Congress set out new goals for the public lands, one of which is that

the public lands be managed in a manner ... that will provide food and habitat for fish and wildlife and domestic animals.... 43 U.S.C. § 1701(a)(8).

Although FLPMA was promulgated long after passage of the UIA, it is certainly proper to consider FLPMA statute in light of UIA, especially since Congress as recently as 1984 considered and amended the UIA. *See, e.g., Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). In the Joint Stipulation of Facts, defendant has agreed that if allowed to stand, his fence might cause an increase in the winter kill of the Baggs antelope herd. At the Hearing on Preliminary Injunction the Court was thoroughly convinced by the undisputed testimony of Mr. Moody and Dr. Alldredge that not only is the enclosed portion of Red Rim critical winter range for the Baggs antelope herd, but that if the fence remains standing, the herd may very probably be decimated by winter starvation. The Court cannot accept as the intent of Congress that the UIA would allow that outcome, when it is clear that defendant could not build his fence to prevent humans

from undertaking mere recreational pastimes, such as hiking or fishing.

■ Defendant next contends that *Camfield* and the UIA do not apply to his fence because of the Taylor Grazing Act, 43 U.S.C. § 315 et seq. Defendant argues that since § 315c allows fencing directly on public lands under permit issued by the Secretary of the Interior, the UIA was implicitly repealed. This argument must fail. First, "repeals by implication are not favored, . . . [t]he intention of the legislature to repeal must be 'clear and manifest.'" [citations omitted]. *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). There is no indication that Congress intended to repeal the UIA through passage of the Taylor Grazing Act, particularly when the UIA was amended as recently as 1984. Although the Grazing Act allows regulation of fencing on public land, it says nothing about fences on private land. The Grazing Act itself perpetuates the major purpose of the UIA, namely, access to public lands:

> Nothing contained in this chapter shall restrict the . . . ingress or egress over the public lands in such districts for all proper and lawful purposes. . . . 43 U.S.C. § 315e (1982).

■ If the Grazing Act repealed the UIA, the Government would be unable to achieve this purpose of the law, because it would have no authorization to prevent unlawful enclosures erected on private lands. The Court is convinced that both the UIA and Grazing Act must be construed *in pari materia. See* Singer, *Sutherland Statutory Construction,* 4th ed., chapters 51 and 53. The Grazing Act regulates fencing on public land, and unless fences on private land conform to these standards, the UIA prevents fences which wrongfully enclose public lands. Reading the statutes in this matter is consistent with the Supreme Court's ruling that "[w]e must read the statutes to give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981).

■ As an adjunct to this argument, defendant contends that the Bureau of Land Management (BLM) tacitly approved the fence, and that the Government should not now be allowed to complain. Although the Government waited almost two years before commencing this suit, the Court is not convinced that mere inaction constitutes approval. Moreover, the BLM's inaction was based not on approval, but on a mistaken belief that BLM lacked the power to prevent defendant from building the fence.

> We told [defendant] that he could not construct the fence on public land, but we didn't think we could prevent him from crossing the fence at the section corners. (June 29, 1979 BLM Memorandum, Stipulation Exhibit B.) . . . The existing allotment boundary fence would be modified as described above [to a sixty inch woven wire fence] on private land . . . The Bureau of Land Management cannot endorse the modification of the fence as proposed. (May 31, 1979 BLM letter to defendant, Stipulation Exhibit B.).

Language such as this does not constitute tacit approval of the fence by the BLM.

■ Defendant also contends that because he has leases to the enclosed public lands pursuant to the Taylor Grazing Act, he is not a mere trespasser, and thus is saved by the proviso in the UIA:

> § 1063 *Provided,* This section shall not be held to affect the right or title of persons, who have gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith.

Defendant's argument is that because he has color of leasehold title, he has gone upon the lands under the land laws of the United States, and his fence is not illegal under the UIA. It, too, must fail.

In *Smith v. Third Nat'l Exchange Bank,* 244 U.S. 184, 37 S.Ct. 516, 61 L.Ed. 1071 (1917), the Supreme Court discussed the UIA proviso.

> It is a sufficient defence to such a [UIA] proceeding to show that the lands enclosed were not public lands of the Unit-

ed States, or that defendant had claim or color of title, made or acquired in good faith, or an asserted right thereto, by or under claim made in good faith, with a view to entry thereof at the proper land office under the general laws of the United States. *Id.* at 190, 37 S.Ct. at 518. Defendant makes no claim that the lands in question do not belong to the United States, or that he has any good faith claim to fee title to the lands because of his Taylor Grazing Act leases. In fact, § 315b of the Grazing Act itself forestalls such an assertion

> [t]he issuance of a permit pursuant to the provisions of this subchapter shall not create any right, title, interest, or estate in or to the lands. 43 U.S.C. § 315b.

Although defendant is not a bare trespasser, neither does he have any claim to color of title over the public lands in question. The UIA proviso does not save defendant's fence.

■ Neither is the fact that the fence is broken by 28 gates, 19 of which are unlocked, enough to take defendant's fence outside the scope of the UIA. Some of the locked gates have "No Trespassing" signs on them; and certainly none of the gates invite the public to come in. The Court is not entirely convinced that all of these gates provide adequate access for humans. However, the question at issue here is access by antelope. The testimony of Mr. Moody and Dr. Alldredge convinces the Court that gates, even if left open, make little or no difference to the antelope, which are creatures of habit that encounter a fence and will trail along it, totally missing small openings such as gates. *See* plaintiff-intervenors' exhibit number 7. It is not the fence itself, but its effect which constitutes the UIA violation. *McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922). The clear, admitted, and intended effect of this fence is to exclude antelope. The presence of gates in it is unimportant.

Finally, defendant contends that *Camfield* and the UIA do not outlaw his fence because of the Supreme Court's decision in *Leo Sheep Co. v. United States,* 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979), which involved a BLM effort to build a road crossing from one public section to another, usually but not always (because of terrain) at the common corner. There the Government contended, *inter alia,* that the Unlawful Inclosures Act prevented the Leo Sheep Company from contesting the Government's right to build a road across its land to provide public access to a reservoir area. The Supreme Court held that in order to build the road, which was in part on private land and invite the public to use it, the Government had to compensate the Leo Sheep Company for use of its land. But, in the opinion, the Court stated:

> Nor do we find the Unlawful Inclosures of 1885 of any significance in this controversy. That Act was a response to the "range wars," the legendary struggle between cattlemen and farmers during the last half of the 19th century. *Leo Sheep* at 683, 99 S.Ct. at 1411.

Defendant concludes that the Supreme Court held by this language that the UIA's purpose was to prevent the continuation of "range wars", and that it should not be extended beyond this purpose. That is not what the Court meant. The UIA indeed was a response to the range wars, but nothing in the act or its history limits its application in such a manner. If the UIA was only meant for such a limited purpose, the Court would have said so in *Camfield,* and Congress should have repealed it in 1934 when the Taylor Grazing Act was passed to end public lands disputes. Certainly Congress would not have amended the UIA in 1984 if the act was now useless.

Because *Leo Sheep* involved the Government's claim to an implied easement at the common corners of a checkerboard tract, the Court only concluded that *Camfield* and the UIA did not "suggest that the Government had the authority asserted here." *Leo Sheep* at 683, 99 S.Ct. at 1411. That does not mean that *Camfield* now has no applicability in this matter. As the *Leo Sheep* Court stated, "[t]hat case [*Cam-*

*field* ] involved a fence that was constructed on odd-numbered lots so as to enclose 20,000 acres of public land...." *Id.* at 683, 99 S.Ct. at 1411. Defendant has erected the same type of fence. Certainly *Camfield* is not applicable to a road question, but it clearly has much to say on the subject of defendant's fence. The Court finds that while *Leo Sheep* has no applicability in this matter, *Camfield* is dispositive of it.

█ Thus, the Court concludes that this matter was decided by the Supreme Court in 1897 in *Camfield v. United States*. Defendant cannot maintain a fence which encloses public lands and prevents the lawful purpose of antelope access to their winter feeding range. The fence clearly constitutes a serious nuisance which must be abated in order to avoid disastrous consequences to the antelope which use Red Rim as winter range. The fence was built ostensibly to protect defendant's crop of crested wheat grass; but, in eight years the defendant has never planted that crop. The Court believes that he does not intend to, either. The fence has an ulterior purpose, and since the parties assured the Court that the mineral rights of that area were not involved, the only reason left for it is the exclusion of antelope from their winter range, which will result in decimation of that herd. The antelope grazed on the Wyoming big sagebrush at Red Rim long before the Daley Ranch was ever built, and unless driven to extinction, will graze there long after it is gone. The Court agrees with the Wildlife Federations that the Unlawful Inclosures Act must be read to avoid such an occurrence and to protect a unique wildlife resource like the Baggs antelope herd. Therefore, it is

ORDERED that the Defendant, Taylor Lawrence, shall within 10 days from and after October 29, 1985 remove the 48" woven wire from the fence at the places in the fence where it has been removed and laid down in the past two winters, in accord with the Order of this Court dated October 29, 1985. It is

FURTHER ORDERED that defendant Lawrence, within 60 days from the date of this Order, shall remove the 48" woven wire from all 28 miles of his Red Rim fence and conform the fence to BLM standards, for enclosure of cattle, or remove it altogether. It is further

ORDERED that if defendant fails to comply with this Order and modify or remove the fence, he shall be in contempt of Court, and subject, from the sixty-first day on until compliance, to a fine of $1,000 [1] per day. It is further

ORDERED that in the event defendant desires to appeal this decision, this Order may be stayed upon his filing of a supersedeas bond, cash or surety, in the amount of $120,000 [2], but that if the defendant demonstrates to the Court that he has complied, and will continue to comply with the October 29, 1985 Order on Preliminary Injunction instructing him to remove the woven wire from those sections of the fence he has laid down in past years in agreement with the State of Wyoming, then this Order may be stayed upon filing of a supersedeas bond, cash or surety, in the amount of $1,000.

---

**1.** Based on an estimate of 2000 antelope in the Baggs herd, at $.50 per head per day.

**2.** Based on the median of $60 per head from the $15 charged for an in-state antelope hunting permit and the $105 charged for an out-of-state antelope hunting permit by the Wyoming Game and Fish Department.

EXHIBIT 1

SOURCE: U.S. Department of Interior, Bureau of Land Management
Rawlins Quad (SE-13) (Revised April 1981). Adapted.

