848 F.2d 1502
 19 Envtl. L. Rep. 20,119
 UNITED STATES of America, ex rel., Brent BERGEN and John
Ernst, Plaintiffs/Appellees,
and
Wyoming Wildlife Federation, a Wyoming non-profit
corporation, and National Wildlife Federation, a
District of Columbia non-profit
corporation,
Plaintiffs/Appellees
in Intervention,
v.
Taylor LAWRENCE, dba Grizzly and Daley Ranch, Defendant/Appellant.
 No. 86-1085.
 United States Court of Appeals,
Tenth Circuit.
 June 17, 1988.
 
 J. Carol Williams, Dept. of Justice, Washington, D.C. (Peter R. Steenland, Jr., Dept. of Justice, Georgina Guy, Regional Sol., Myles E. Flint, Deputy Asst. Atty. Gen., Richard A. Stacy, U.S. Atty., Cheyenne, Wyo. with her on the briefs), for plaintiffs/appellees.
 Thomas David Lustig, Nat. Wildlife Federation, Boulder, Colo., for plaintiffs/appellees in intervention.
 Catherine MacPherson (John A. MacPherson, with her on the briefs), Johnson, MacPherson & Noecker, Rawlins, Wyo., for defendant/appellant.
 Before MOORE and ANDERSON, Circuit Judges, and PHILLIPS*, District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Taylor Lawrence appeals from a final order of the United States District Court for the District of Wyoming, ordering him to remove from his lands a fence which enclosed public lands contrary to the Unlawful Inclosures of Public Lands Act, 43 U.S.C. Secs. 1061 to 1066. See United States ex rel. Bergen v. Lawrence, 620 F.Supp. 1414 (D.Wyo.1985). We affirm the district court's order.
 
 I.
 
 2
 Lawrence constructed a twenty-eight mile fence enclosing over twenty thousand acres of private, state and federal lands in an area of south central Wyoming known as the Red Rim.[1] The land in this area is owned in the familiar "checkerboard" pattern as the result of the federal land grant to the Union Pacific Railroad.[2] Lawrence has fee title or permission to fence from the title owner of the private sections and has grazing permits on the federal and state sections. The fence enclosed 15 sections, or approximately 9,600 acres of unreserved public domain. However, the fence was constructed entirely on private lands, except where it crosses the common corners of state and federal sections.
 
 
 3
 Lawrence grazes his cattle on the Red Rim during the spring and summer months for about 60 days. But during the winter, portions of the Red Rim provide critical range for Wyoming pronghorn antelope. The fence Lawrence constructed, however, was antelope-proof, denying antelope access to this critical winter range. The winter of 1983 was unusually severe (even for Wyoming) and the testimony to the district court indicated that antelope collected against the fence and starved in an unsuccessful attempt to reach the Red Rim.
 
 
 4
 The government brought this action under a statute adopted by Congress in 1885, the Unlawful Inclosures of Public Lands Act, 43 U.S.C. Secs. 1061 to 1066 ("UIA"), seeking an order compelling removal of the fence or modification to allow free and unrestricted access by pronghorn antelope to the enclosed public lands.[3] The Wyoming and National Wildlife Federations were joined as intervenors and moved for a preliminary injunction to have portions of the fence removed before the winter of 1985. At the hearing on the motion for a preliminary injunction, the district court consolidated the matter into a full hearing on the merits pursuant to Fed.R.Civ.P. 65(a)(2). At the conclusion of the hearing, the court orally granted the preliminary injunction, ordering Lawrence to remove certain portions of the fence within 10 days and to remove the entire fence or modify it to conform with Bureau of Land Management ("BLM") standards[4] within 60 days. A few days later, the district court entered a final judgment and order directing that the entire fence be removed or modified. Lawrence appeals from the district court's order.
 
 II.
 
 5
 The district court concluded that this case was controlled by Camfield v. United States, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897) which dealt with a "virtually identical" situation. As the district court explained:
 
 
 6
 "Camfield acquired from Union Pacific the rights to several odd-numbered private sections of land, and
 
 
 7
 'in building the fence complained of, the defendants had constructed it entirely on odd-numbered sections ... so as to completely enclose all of the government lands aforesaid, but without locating the fence on any part of the public domain so included. Id. at 519, 17 S.Ct. at 864.'
 
 
 8
 "The Supreme Court considered Camfield's argument that he could do whatever he wished on his own land, and soundly rejected it. The Court found that the Unlawful Inclosures Act had been promulgated just to avoid such an outcome.
 
 
 9
 'If the act be construed as applying only to fences actually erected upon public lands, it was manifestly unnecessary, since the Government as an ordinary proprietor would have the right to prosecute for such a trespass. It is only by treating it as prohibiting all "enclosures" of public lands, by whatever means, that the act becomes of any avail. Id. at 525, 17 S.Ct. at 867.'
 
 
 10
 "Finally, the Court concluded that defendant's intent, whether to irrigate the public lands or use them for pasturage, was unimportant. The only matter at issue was whether or not the fence violated the statute.
 
 
 11
 'The device to which defendants resorted was certainly an ingenious one, but it is too clearly an envasion (sic) to permit our regard for the private rights of defendants as landed proprietors to stand in the way of an enforcement of the statute.... Considering the obvious purposes of this structure, and the necessities of preventing the enclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual. Camfield, at 525, 17 S.Ct. at 867.'
 
 
 12
 "The situation in this matter is virtually identical to that dealt with by the Supreme Court in Camfield. Although written in 1897, Camfield is still good law, and in fact was relied upon by the Supreme Court as recently as 1983 in North Dakota v. United States, 460 U.S. 300, 319, 103 S.Ct. 1095, 1106, 75 L.Ed.2d 77 (1983)."
 
 
 13
 Bergen, 620 F.Supp. at 1416.
 
 
 14
 Lawrence was unsuccessful in his attempts to distinguish his fence from the fence in Camfield. He renews those attempts on appeal, challenging the district court's interpretation of the applicable law. The district court's rulings on legal questions are subject to de novo review, while determinations of factual questions are reversed only if they are clearly erroneous. In re Tri-State Equipment, Inc., 792 F.2d 967, 970 (10th Cir.1986).
 
 
 15
 Initially, however, we must address Lawrence's characterization of the issue in this case. He argues that the order of the district court directing that the fence be removed or modified to allow passage by antelope imposes a "servitude" on his land, or grants the antelope an "easement" across them. Lawrence then argues that he must be compensated for this "taking." We disagree with Lawrence's description of the district court's order. In declaring that the fence must be removed, the district court did not grant the antelope any easement across Lawrence's private lands, nor do we. That question is simply not at issue here. Instead, the issue in this case is merely whether the fence constructed and maintained by Lawrence unlawfully encloses federal lands. Federal law declares such fences to be nuisances which must be removed.
 
 
 16
 In arguing that the district court's order creates an implied easement for antelope, Lawrence relies on Leo Sheep Co. v. United States, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979), but we find that decision inapplicable here. Leo Sheep also involved the Union Pacific Railroad grant and land ownership checkerboard in Wyoming. The government cleared a road across public and private lands to provide public access to the Seminoe Reservoir, used by the public for hunting and fishing. When the private landowner sued for relief, this court held that Congress had implicitly reserved an easement across the private lands in the Union Pacific Railroad grant. Leo Sheep Co. v. United States, 570 F.2d 881, 885 (10th Cir.1977), rev'd, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979). We relied, in part, upon the Unlawful Inclosures of Public Lands Act and Camfield to reach that decision. Id. at 886-88. But our decision was reversed by the United States Supreme Court, which found the UIA of no "significance in this controversy," Leo Sheep, 440 U.S. at 683, 99 S.Ct. at 1411, and held that neither the UIA nor the railroad grant reserved any easement for a public road across private lands. Thus, the government was required to compensate the Leo Sheep Company for the use of its land. In discussing the UIA, the Court noted that it was "a response to the 'range wars,' " and "the illegal fencing of public lands, which was often the product of the checkerboard pattern of railroad grants. By placing fences near the borders of their parts of the checkerboard, cattlemen could fence in thousands of acres of public lands." Id. at 683-84, 99 S.Ct. at 1412.
 
 
 17
 Lawrence urges, based on Leo Sheep, that we find the UIA inapplicable here and follow the Supreme Court's holding rejecting any reserved easements in the Union Pacific land grant. Once again, we turn to the district court's analysis:
 
 
 18
 "[Lawrence] concludes that the Supreme Court held ... that the UIA's purpose was to prevent the continuation of 'range wars,' and that it should not be extended beyond this purpose. That is not what the Court meant. The UIA indeed was a response to the range wars, but nothing in the act or its history limits its application in such a manner. If the UIA was only meant for such a limited purpose, the Court would have said so in Camfield, and Congress should have repealed it in 1934 when the Taylor Grazing Act was passed to end public land disputes....
 
 
 19
 "Because Leo Sheep involved the Government's claim to an implied easement at the common corners of a checkerboard tract, the Court only concluded that Camfield and the UIA did not 'suggest that the Government had the authority asserted here.' Leo Sheep, at 683, 99 S.Ct. at 1411. That does not mean that Camfield now has no applicability in this matter. As the Leo Sheep Court stated, '[t]hat case [Camfield ] involved a fence that was constructed on odd-numbered lots so as to enclose 20,000 acres of public land....' Id. at 683, 99 S.Ct. at 1411. [Lawrence] has erected the same type of fence. Certainly Camfield is not applicable to a road question, but it clearly has much to say on the subject of defendant's fence."
 
 
 20
 Bergen, 620 F.Supp. at 1419-20. We find the district court's reasoning persuasive. In contrast, under Lawrence's reasoning, the UIA became superfluous as early as 1934 when the Taylor Grazing Act put an end to the open public range, or at the latest in 1976 when the last of the homesteading acts was repealed by the Federal Land Policy and Management Act ("FLPMA"). Yet the UIA remains federal law, and was amended in 1984 when Congress modified a procedural provision.[5] We refuse to repeal the UIA by implication, see Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) and therefore, must give effect to its provisions. The UIA declares enclosures of federal lands to be unlawful and orders that such enclosures be removed. It creates no easements or servitudes. Thus, Lawrence's central argument, that the antelope have no easement across his lands, is not relevant to our decision.[6] We conclude with the district court that "while Leo Sheep has no applicability in this matter, Camfield is dispositive of it." Bergen, 620 F.Supp. at 1420.
 
 
 21
 In a related argument, Lawrence claims that the district court's ruling effects an impermissible and unconstitutional taking:
 
 
 22
 "The imposition of a public servitude on private property for antelope without payment of compensation violates the Fifth Amendment of the United States. If a statute should provide that one person may be compelled to allow antelope to use property privately owned without any requirement that compensation be paid to the owner, the statute would be unconstitutional."
 
 
 23
 Brief of Appellant at 22. We reject this argument for several reasons.
 
 
 24
 First, of course, we have already explained that the district court's decision did not impose a servitude for antelope, but rather, abated a nuisance proscribed by federal law. The government's power to act in this regard was settled by Camfield:
 
 
 25
 "Considering ... the necessities of preventing the enclosing of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual. The general Government doubtless has a power over its own property analogous to the police power of the several States, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case. If it be found to be necessary for the protection of the public, or of intending settlers, to forbid all enclosures of public lands, the Government may do so, though the alternate sections of private lands are thereby rendered less available for pasturage."
 
 
 26
 Camfield, 167 U.S. at 525, 17 S.Ct. at 867; see also Mackay v. Uinta Development Co., 219 F. 116, 119 (8th Cir.1914). This power is not diminished where Congress acts to protect antelope rather than people. Camfield 's characterization of the federal property power was recently reaffirmed with regard to wildlife by the Supreme Court in Kleppe v. New Mexico, 426 U.S. 529, 538, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976) where the Court upheld the constitutionality of the Wild Free-roaming Horses and Burros Act. See also Minnesota v. Block, 660 F.2d 1240, 1249 & n. 18 (8th Cir.1981) (Congressional power extends to conduct "on or off the public land"), cert. denied, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982).
 
 
 27
 Second, we can find nothing of Lawrence's that has been "taken." Certainly, his federal grazing leases are not damaged as a portion of the animal unit months ("AUMs") for those leases is reserved for wildlife, presumably including antelope. Moreover, evidence at the trial indicated that competition between antelope and cattle was minimal. See, e.g., R. Vol. II at 86 ("[A]t the time the pronghorn are in Red Rim in the winter, they are foraging almost strictly on sagebrush, which is something cattle rarely use."). There is also evidence in the record suggesting that foraging by antelope may actually improve the range for cattle. Even if there is some conflict, this court has already held that foraging by wildlife in the federal/private checkerboard in Wyoming is not a taking. Mountain States Legal Foundation v. Hodel, 799 F.2d 1423, 1429-32 (10th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987).
 
 
 28
 Finally, Lawrence retains the right to exclude antelope from his own lands if he can accomplish that exclusion without at the same time effecting an enclosure of the public lands.[7] Again, Camfield states the law:"So long as the individual proprietor confines his enclosure to his own land, the Government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it, regardless of any detriment to his neighbor; but when, under the guise of enclosing his own land, he builds a fence which is useless for that purpose, and can only have been intended to enclose the lands of the Government, he is plainly within the statute, and is guilty of an unwarrantable appropriation of that which belongs to the public at large."
 
 
 29
 Camfield, 167 U.S. at 528, 17 S.Ct. at 867.[8] See also Mountain States, 799 F.2d at 1428 n. 8. All that Lawrence has lost is the right to exclude others, including wildlife, from the public domain--a right he never had.
 
 
 30
 We now turn to Lawrence's efforts to distinguish his fence from the unlawful fence in Camfield. The heart of Lawrence's argument is that the UIA is simply inapplicable to antelope. The UIA provisions at issue provide as follows:
 
 
 31
 "All inclosures of any public lands in any State or Territory of the United States, heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation, to any of which land included within the inclosure the person, party, association, or corporation making or controlling the inclosure had no claim or color of title made or acquired in good faith, ... are hereby declared to be unlawful, and the maintenance, erection, construction, or control of any such inclosure is hereby forbidden and prohibited; ..."
 
 
 32
 43 U.S.C. Sec. 1061.
 
 
 33
 "No person, by force, threats, intimidation, or by any fencing or inclosing, or any other unlawful means, shall prevent or obstruct, ... any person from peaceably entering upon or establishing a settlement or residence on any tract of public land subject to settlement or entry under the public land laws of the United States, or shall prevent or obstruct free passage or transit over or through the public lands. Provided, This section shall not be held to affect the right or title of persons, who have gone upon, improved, or occupied said lands under the land laws of the United States, claiming title thereto, in good faith."
 
 
 34
 43 U.S.C. Sec. 1063 (emphasis added).
 
 
 35
 The district court relied on the emphasized clause in section 3 to conclude that the UIA prohibition against enclosing public lands was not limited to people. According to the district court, "[t]hat clause does not contain the word 'person,' and neither does the Court believe that 'person' from the preceding clause should be read into it. Had Congress intended only to protect people, the first clause would have accomplished that purpose without necessity of the second clause." Bergen, 620 F.Supp. 1417.
 
 
 36
 We agree with the district court, but find additional reasons to extend the UIA to these circumstances. First, the language in section 1 is even more emphatic and absolute than that of section 3. According to the statute, "all inclosures of any public lands ... are ... declared to be unlawful." Lawrence points to the legislative history of the UIA, and finding no mention of wildlife, asks us to narrow the applicability of the statute. Because the language of the statute is clear, however, we do not have that option. "If a statute is clear on its face, there is no necessity to look to legislative history." Jones v. Intermountain Power Project, 794 F.2d 546, 552 (10th Cir.1986). See also Consumer Prod. Safety Comm'n. v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.").[9]
 
 
 37
 We also find support to extend the UIA beyond people in the early interpretations of the statute.[10] In Mackay v. Uinta Development Co., 219 F. 116 (8th Cir.1914) the court relied on the UIA and Camfield to find that livestock may not be denied access to federal lands in the Union Pacific checkerboard. Even more instructive is the language of Stoddard v. United States, 214 F. 566 (8th Cir.1914). In Stoddard, as here, the defendant argued that section 3 of the UIA referred to "the obstruction of free passage or transit over the public lands of persons only." Id. at 568. The Stoddard court ordered removal of a fence on private land that obstructed the free range of livestock to public land, and, like the district court here, refused to read the limitation to "persons" into that clause, and concluded that the UIA "was intended to prevent the obstruction of free passage or transit for any and all lawful purposes over public lands." Id. at 568-69 (emphasis added).
 
 
 38
 Thus, the question becomes whether winter forage by antelope is a lawful purpose of public lands. Any doubt may be resolved by reference to FLPMA, where Congress directed that "the public lands be managed in a manner ... that will provide food and habitat for fish and wildlife and domestic animals." 43 U.S.C. Sec. 1701(a)(8).
 
 
 39
 Lawrence objects to the reliance on FLPMA to ascertain the limits of the UIA: "It is absurd to suppose that 1976 declarations of Congress regarding public land administration could be construed to amend by implication the language and purpose of the UIA enacted in 1885." Brief of Appellant at 38-39. This criticism misses the point of the analysis. Neither this court nor the district court rely on FLPMA to amend the UIA. The UIA proscribes unlawful enclosures; enclosures are unlawful when they deny access to public lands for "lawful purposes"; Congressional guidance in FLPMA is relevant to assist the court in determining what uses of the public lands are lawful, and therefore protected under the UIA. Obviously, lawful uses of the public lands will change over time. For example, as Lawrence notes, the primary purpose of the UIA in the early part of this century was to prevent the exclusion of homesteaders from the public lands. With the repeal of the homesteading laws, that is no longer a "lawful purpose." The district court did not look to FLPMA to determine the intent of Congress in 1885, but rather, to determine what "lawful purposes" were protected by the UIA in 1985. That was both appropriate and necessary.
 
 
 40
 Second, Lawrence claims that the passage of the Taylor Grazing Act distinguishes his fence from the one in Camfield. The argument takes several forms.
 
 
 41
 The UIA includes one statutory defense: There is no unlawful enclosure where the defendant has a claim or color of title to the enclosed lands that was acquired in good faith. See 43 U.S.C. Secs. 1061, 1063. Lawrence claims that, by virtue of his Taylor Grazing Act leases of the federal lands enclosed by the fence, he has color of leasehold title, rendering the UIA inapplicable. However, the cases interpreting this defense consistently rely on color of fee title. See, e.g., Smith v. Third Nat'l Exchange Bank, 244 U.S. 184, 37 S.Ct. 516, 61 L.Ed. 1071 (1917); Cameron v. United States, 148 U.S. 301, 13 S.Ct. 595, 37 L.Ed. 459 (1893). We see no reason to abandon that interpretation. In addition, the language of the Taylor Grazing Act negates Lawrence's claim, for "[t]he issuance of a [grazing] permit ... shall not create any right, title, interest, or estate in or to the lands." 43 U.S.C. Sec. 315b.
 
 
 42
 Lawrence also argues that a fence enclosing public lands leased under the Taylor Grazing Act is not an unlawful enclosure where the fence is not in violation of the terms of the lease or grazing regulations. Because Lawrence constructed the fence on his private lands, he maintains that the BLM fencing regulations did not apply to his fence and therefore, he did not violate his lease terms or the regulations. Thus, while Lawrence concedes that BLM may regulate fences constructed on federal lands, he disputes the extension of those regulations to fences on private lands, and argues that the district court had no authority to order the fence modified to meet BLM standards. This is merely a variation of Camfield's argument to the Supreme Court in 1896. Camfield argued that the UIA could not reach his fence, as it was constructed on private land. The Court disagreed:
 
 
 43
 "If the act be construed as applying only to fences actually erected upon public lands, it was manifestly unnecessary, since the Government as an ordinary proprietor would have the right to prosecute for such a trespass. It is only by treating it as prohibiting all 'enclosures' of public lands, by whatever means, that the act becomes of any avail."
 
 
 44
 Camfield, 167 U.S. at 525, 17 S.Ct. at 867. If the government can demand removal of a fence on private land, certainly it may order the fence modified to abrogate the "enclosing" effect that makes the fence unlawful.
 
 
 45
 Moreover, the Taylor Grazing Act reinforces the UIA's mandate that access to public lands be preserved: "Nothing contained in this subchapter shall restrict the ... ingress and egress over the public lands .. for all proper and lawful purposes ..." 43 U.S.C. Sec. 315e. The district court sought to read the provisions of the UIA and Taylor Grazing Act together " 'to give effect to each ... while preserving their sense and purpose.' " Bergen, 620 F.Supp. at 1418 (quoting Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981)). We believe the district court's ruling accomplishes this goal. As noted above, the UIA preserves access to federal lands for "lawful purposes," including forage by wildlife.[11] Where a fence is constructed so that it does not obstruct other lawful uses of the federal lands, it is not an unlawful enclosure.[12]
 
 
 46
 Finally, Lawrence claims that because the fence includes several unlocked gates, there is no unlawful enclosure absent evidence that the fence excludes entry by members of the public with "lawful entitlement to use of the enclosed public lands." Initially, we note again that the district court did not reach the question of public access. See supra note 3. The court found, however, as a matter of fact, that the fence did exclude antelope. Bergen, 620 F.Supp. 1419.[13] That finding is not disputed by Lawrence. He merely restates his premise that antelope have no right of access, and argues from that premise that the presence of unlocked gates and the possibility of public access renders the fence lawful. We have already held that the UIA applies to wildlife as well as people. It follows that Lawrence's antelope-proof fence is prohibited by the UIA.
 
 
 47
 There are additional reasons to reject this argument. The mere presence of gates or openings in a fence does not mean the enclosure is lawful. As the district court concluded, "[i]t is not the fence itself, but its effect which constitutes the UIA violation." Bergen, 620 F.Supp. at 1419. Even the fence in Camfield included swinging gates at the section lines to afford access, yet the Court found that fence unlawful. Cf. Stoddard, 214 F. at 568 (fence must be removed despite openings). Of course, not every fence is a violation of the UIA. Lawrence relies upon Golconda Cattle Co. v. United States, 214 F. 903 (9th Cir.1914), where a fence was allowed to remain, but in that case, the court found that access was sufficient:
 
 
 48
 "While those fences were very extensive, amounting in the aggregate to about 40 miles in length, various openings were left in them at points most frequently used by cattle and other animals in their passage to and from the grazing lands of the United States, and at points at which the public highways entered and left the appellants' lands, which openings were nine in number, the widest of which was 3,400 feet in width, and the narrowest 90 feet; ... Such openings, ... in our opinion admitted of reasonable access by the public to the public domain, for which reason the fences in question cannot be properly held to unlawfully inclose the lands of the United States."
 
 
 49
 Id. at 909. In contrast, here the court found that the gates were clearly insufficient to allow access by antelope and refused to find that public access was unhampered by the fence.[14]
 
 
 50
 Finding no reason to distinguish this case from Camfield, we agree with the district court "that this matter was decided by the Supreme Court in 1897 in Camfield v. United States. [Lawrence] cannot maintain a fence which encloses public lands and prevents the lawful purpose of antelope access to their winter feeding range." Bergen, 620 F.Supp. at 1420.
 
 III.
 
 51
 Lawrence also raises objections to the preliminary injunction entered by the district court. First, Lawrence claims that the district court improperly allowed evidence concerning the impact of the fence on antelope. To obtain an injunction, the moving party must show, inter alia, that "the movant will suffer irreparable injury unless the injunction issues." City of Chanute v. Kansas Gas & Elec. Co., 754 F.2d 310, 312 (10th Cir.1985). The evidence which Lawrence objected to addresses that question. It also tends to show that Lawrence's fence denied a lawful use of federal lands. In addition, Lawrence demonstrates no prejudice from the district court's ruling on this evidence. We find no error on this point, nor do we find any flaw in the final judgment. Contrary to Lawrence's assertion, the district court's order was based on a finding that the fence violated the UIA, not on the harm to the antelope.
 
 
 52
 Lawrence's other complaints about the preliminary injunction are moot. "With the entry of the final judgment, the life of the preliminary injunction came to an end, and it no longer had a binding effect on any one. The preliminary injunction was by its very nature interlocutory, tentative and impermanent." Madison Square Garden Boxing, Inc. v. Shavers, 562 F.2d 141, 144 (2d Cir.1977) (citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir.1953)); see also Ameron, Inc. v. U.S. Army Corps of Engineers, 610 F.Supp. 750, 757 (D. N.J. 1985) ("Where ... a final judgment has been entered on the merits, the preliminary injunction comes to an end and is superseded by the final order."), aff'd on rehearing as modified, 809 F.2d 979 (3d Cir.1986). The district court entered the final judgment a few days after the preliminary injunction. That judgment superseded the preliminary injunction and was the subject of this appeal.
 
 
 53
 Finding no error in the district court's final judgment, that order is AFFIRMED.
 
 
 
 *
 Hon. Layn R. Phillips, U.S. District Court for the Western District of Oklahoma, sitting by designation
 
 
 [1]
 We adopt the statement of facts set forth by the district court, Bergen, 620 F.Supp. at 1415-16, and only briefly summarize those facts here
 
 
 [2]
 The Union Pacific Act of 1862 and the railroad land grants are explained by Justice Rehnquist in Leo Sheep Co. v. United States, 440 U.S. 668, 672-77, 99 S.Ct. 1403, 1406-08, 59 L.Ed.2d 677 (1979)
 
 
 [3]
 The government's complaint also sought an order "to further allow ingress and egress by the public to the public lands enclosed within the fence." R. Vol. I, Tab 1 at 3. The district court did not determine whether the public had been denied access, see Bergen, 620 F.Supp. at 1419 ("The Court is not entirely convinced that all of these gates provide adequate access for humans. However, the question at issue here is access by antelope."), nor do we. The fact that the public lands were enclosed so as to restrict lawful forage by wildlife is sufficient for our decision here
 
 
 [4]
 Pursuant to the Taylor Grazing Act, BLM has promulgated standards for fences for cattle operations on federal lands. The "BLM-approved" fence is designed to allow antelope to go under and over the fence
 
 
 [5]
 In 1984, Congress deleted the provision from 43 U.S.C. Sec. 1062 that any suit brought under the UIA had precedence for hearing and trial over other cases on the civil docket of the court and had to be tried and determined at the earliest possible date
 
 
 [6]
 While we do not decide this question, we note in passing that the Wyoming and National Wildlife Federations, as intervenor-appellees, make a strong case for distinguishing the antelope's right of access from the government's case in Leo Sheep. Accordingly, we are not saying that wildlife have no such rights relative to federal lands; we simply do not reach that question in this case. Cf., e.g., Leo Sheep, 440 U.S. at 687 n. 24, 99 S.Ct. at 1413 n. 24, (distinguishes Leo Sheep from Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890))
 
 
 [7]
 Lawrence retains the right to exclude the antelope at this time because the district court did not find any implied easement for antelope. If Lawrence attempts such an exclusion, an action might be brought claiming such an easement or servitude. At that time, this question would be proper for judicial consideration. We also recognize, as did the Camfield Court, that a separate enclosure for each of the square-mile sections of land owned by Lawrence is "scarcely a practical question." Camfield, 167 U.S. at 528, 17 S.Ct. at 868
 
 
 [8]
 Lawrence relies on this language, and other cases applying the UIA, to argue that the intent of the fence builder "is of paramount importance." We are not persuaded that intent is a controlling factor, or that it would matter here if it was. First, we note that Camfield was not concerned with the landowner's intent. See Camfield, 167 U.S. at 528, 17 S.Ct. at 868; see also Homer v. United States, 185 F. 741, 745 (8th Cir.1911) ("The statute itself ... makes no mention of any specific intent. It condemns 'all inclosures.' "); but see Golconda Cattle Co. v. United States, 214 F. 903 (9th Cir.1914) (intent considered). Camfield focused on the effect of the fence, not the landowner's intent. In this case, the effect of the fence is to exclude antelope from the public lands. In addition, the district court found that the intent of the fence was to exclude antelope. Bergen, 620 F.Supp. at 1420. That finding is not clearly erroneous. Thus, whether Lawrence's intent in building the fence is relevant or not, the fence is unlawful under the UIA
 
 
 [9]
 In addition, Lawrence's references to the legislative history of the statute are inconclusive. There is no indication that wildlife was not meant to be protected, merely an emphasis on the interests of homesteaders and livestock. In the face of clear statutory language, the fact that the legislative history does not mention a congressional intent to prohibit fences excluding wildlife from public lands does not convince us to so limit the statute. Even if we agreed that the only purpose of the UIA was to provide access for homesteaders, we would be forced to apply the statute here, for "the plainer the statutory language, the more convincing the contrary legislative history must be before the court follows the purpose over the literal words." Medler v. Bureau of Reclamation, 616 F.2d 450, 453 (9th Cir.1980)
 
 
 [10]
 The district court also relied on these early cases. See Bergen, 620 F.Supp. at 1417-18
 
 
 [11]
 As we have noted, some of the AUMs on the enclosed public land were reserved for wildlife. The fence effectively precluded the use of these reserved AUMs, thus, we are not prepared to accept Lawrence's assertion that the fence was not in violation of the Taylor Grazing Act or his lease terms. Lawrence claims that the parties stipulated that the fence did not violate the lease or regulations. The Wildlife Federations disagree. See Brief for Intervenors/Appellees at 41 n. 59. We find nothing in the stipulations that directly supports Lawrence's claim, although the BLM did not believe it could control construction of the fence on private land. See Bergen, 620 F.Supp. at 1418. In either event, this point is not central to our decision, and we have no reason to decide whether Lawrence was in compliance with his grazing lease and the Taylor Grazing Act regulations
 
 
 [12]
 In a related argument, Lawrence argues that the district court had no authority to require removal or modification of the entire 28 miles of fence. We believe that the district court's order is within the authority granted by the statute and Camfield. See 43 U.S.C. Sec. 1062 ("[I]f the inclosure shall be found to be unlawful, the court shall make the proper order, judgment, or decree for the destruction of the inclosure, in a summary way, unless the inclosure shall be removed by the defendant within five days after the order of the court.")
 
 
 [13]
 Once again the district court's analysis is instructive:
 "Neither is the fact that the fence is broken by 28 gates, 19 of which are unlocked, enough to take [Lawrence's] fence outside the scope of the UIA. Some of the locked gates have 'No Trespassing' signs on them; and certainly none of the gates invite the public to come in. The Court is not entirely convinced that all of these gates provide adequate access for humans. However, the question at issue here is access by antelope. The testimony of Mr. Moody and Dr. Allredge convinces the Court that gates, even if left open, make little or no difference to the antelope, which are creatures of habit that encounter a fence and will trail along it, totally missing small opening such as gates.... The clear, admitted, and intended effect of this fence is to exclude antelope. The presence of gates in it is unimportant."
 Bergen, 620 F.Supp. at 1419.
 
 
 [14]
 We are similarly unpersuaded by other cases cited by Lawrence. See, e.g., Potts v. United States, 114 F. 52, 55 (9th Cir.1902) ("evidence tends to show that no public land had actually been inclosed by the fence of the defendant alone"); United States v. Rindge, 208 F. 611, 622 (S.D.Cal.1913) ("[S]ince ... the public lands can be reached without crossing the ranch, the fences in question do not constitute an inclosure...."); Anthony Wilkinson Livestock Co. v. McIlquam, 14 Wyo. 209, 83 P. 364, 367-68 (1905) ("Cases arising out of the unlawful inclosure of government lands are not applicable to the case at bar.... Defendant has not inclosed government land, and none of its fences will prevent or obstruct free passage or transit over or through the public lands in question....")